[No. S004785. Crim. No. 26419. Oct. 31, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE LEON FUENTES, Defendant and Appellant.

**COUNSEL**

Chris G. Gasparich, under appointment by the Supreme Court, Miller, Starr & Regalia and Michael J. Hassen for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Donald E. de Nicola, Susan Lee Frierson and Carol Frederick Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PANELLI, J.**—Defendant Jose Leon Fuentes appeals from the sentence of death imposed on retrial after this court reversed the judgment of death in

*People* v. *Fuentes* (1985) 40 Cal.3d 629 [221 Cal.Rptr. 440, 710 P.2d 240] (*Fuentes I*). In *Fuentes I* a jury had convicted defendant of first degree murder (Pen. Code, §§ 187, 189),[1] attempted robbery (§§ 664, 211), and automobile theft (Veh. Code, § 10851) and had found true a special circumstance allegation of attempted robbery (§ 190.2, subd. (a)(17)(i)). The special circumstance allegation has been retried and found true, and the jury has reimposed the death penalty. This appeal is automatic (§ 1239, subd. (b)).

We conclude that defendant's constitutional right to trial by a jury drawn from a representative cross-section of the community (Cal. Const., art. I, § 16) was violated by the trial court's failure to carefully evaluate the prosecutor's explanations for peremptory challenges to Black prospective jurors, which it must do in order to determine whether the challenges reflected a constitutionally impermissible group bias. (See *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (hereafter *Wheeler*); *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854].)

The evidence presented on retrial of the special circumstance and penalty phases paralleled that introduced in the first trial: On December 1, 1980, defendant and an accomplice, both of whom were armed, attempted to rob a Brinks guard as he was leaving the cashier's office of a department store. Defendant and the guard fell, wounded, when gunshots were fired. The guard died. The accomplice escaped and was never apprehended. A gun found near defendant proved to be the weapon which had fired the fatal bullets. At the penalty phase, defendant stipulated that he had suffered prior robbery convictions. In mitigation, he presented the testimony of his family members and prison counselor, who noted his exemplary academic and work record while incarcerated. (See *Fuentes I, supra*, 40 Cal.3d at pp. 633-637.)

*The Voir Dire.*

Following *Witherspoon* voir dire (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) and voir dire on challenges for cause, several jurors were excused for cause; thereafter, prospective jurors returned to court for peremptory challenge.[2] The prosecutor exercised 19 peremptory challenges. Of the 13 prospective trial jurors challenged, 10 were Black. Of

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Each of the 110 prospective jurors not excused for hardship had already completed an 18-page questionnaire with 111 questions. The questionnaire, which was intended to "streamline the voir dire," solicited the prospective jurors' views on the death penalty and their background, education, experience, and attitudes.

the 6 prospective alternates challenged, 4 were Black. As finally constituted, the trial jury included 3 Black jurors and 3 Black alternates.

Defense counsel made the first of several objections on *Wheeler* grounds after the prosecutor exercised each of his initial four challenges against Black prospective jurors. The trial court asked the prosecutor for an explanation, but the prosecutor was not prepared to give one. He said: "I have only 'yes/no' on my sheet, Your Honor. To be able to answer any challenge, I will need to get the transcripts and the questionnaires and to go over it [*sic*] in some detail with the court. I would not begin to try and remember at this point all of the reasons which is [*sic*] necessary for the People to put on the record in order to satisfy the court that the purpose and reason for challenging these jurors has [*sic*] nothing to do with race but strictly with their answers to the questions and the voir dire itself." The trial court indicated that it would note which prospective jurors were Black and that it would "have the reasons set forth by the People" before trial commenced.

The prosecutor thereafter excused, in this order, two more Black jurors, one juror who was not Black, and then yet another Black juror. When defense counsel again objected on *Wheeler* grounds, the court stated that it would "consider [counsel's objection] a continuing motion" but did not inquire further into the matter. The prosecutor's next three challenges were also to Black jurors. Finally, the prosecutor excused two jurors who were not Black. In total, the prosecutor exercised 13 peremptory challenges to the trial jury. Ten of his first 11 challenges were to Black jurors. During the ensuing selection of alternates, the prosecutor peremptorily challenged 4 more Black jurors.

At the conclusion of voir dire, the court finally addressed the *Wheeler* motion. The prosecutor began by arguing that his challenges did not establish a prima facie case of group bias. When defense counsel pointed out that the prosecutor had exercised almost every challenge against Blacks, the prosecutor irrelevantly responded: "And I think that the defense has excused almost all White jurors, your Honor." At this point, the court instructed the prosecutor: "[G]o down and get your records so we can put [your reasons for excusing Blacks] in the record."

More than three hours later, the prosecutor returned with his records. During the ensuing two hours he perused the daily transcripts and the questionnaires, offering a multitude of purported reasons—as many as a dozen or more in most cases—to justify his challenge of each juror. The prosecutor apparently did not have notes on the reasons for his challenges; he sometimes quoted and sometimes paraphrased a juror's response, but without page citation to the transcript or to the questionnaire. Defense

counsel complained that the prosecutor was merely reading from the transcripts and was not giving the "reasons" why the juror was excluded, i.e., was not explaining how the juror in question was revealing a possible bias that was relevant to the case. Counsel also expressed concern that the prosecutor was not presenting the context of his quotations and paraphrases.

Following the prosecutor's rambling attempt to explain his challenges, the court took defendant's *Wheeler* motion under submission. On the following morning, the court ruled that no prima facie showing had been made. Despite this ruling, however, the court examined the prosecutor's purported reasons for excusing the 14 Black jurors. Addressing the challenged jurors as a group, the court found that some of the prosecutor's excuses were "totally unreasonable" and others "very spurious." The court also stated, however, that there were "some good reasons" for the prosecutor's challenges, namely, that certain unidentified prospective jurors or their relatives had been arrested, had leanings against the death penalty, or, in one case, had given responses that "should not be trusted." Except for that one juror, however, identified only as "a gentleman from the navy," the court did not identify any particular juror or indicate which of the purportedly "good reasons" applied to which jurors. In conclusion, the trial court found that the People had not excluded Blacks improperly and denied defendant's motion. Later, after the trial court had gone on to other pretrial matters, the prosecutor interrupted to add that his challenges had not been based solely on "particular questions" but also on "body language." The trial court ignored the interruption.

Defendant assigns as error the trial court's denial of his motion pursuant to *Wheeler, supra,* 22 Cal.3d 258. The principles first articulated in that case are now well settled. (See *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1215-1216 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Turner* (1986) 42 Cal.3d 711, 715-717 [230 Cal.Rptr. 656, 726 P.2d 102]; *People* v. *Hall, supra,* 35 Cal.3d 161, 166-167.) ■ A party may not use peremptory challenges to remove prospective jurors solely on the basis of group bias. Group bias is a presumption that jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*Wheeler, supra,* 22 Cal.3d at p. 276.) In *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], the United States Supreme Court held that peremptory challenges based solely on race also violated the federal equal protection clause when the defendant is a member of the race being challenged. Although *Batson* has no application in this case,[3] the high

---

[3]Defendant, an Hispanic immigrant from Cuba, is not of the same race as the challenged jurors.

court has recently extended the *Batson* holding and given a defendant, regardless of race, standing to object to the racially discriminatory use of peremptory challenges. (*Powers* v. *Ohio* (1991) __ U.S. __ [113 L.Ed.2d 411, 111 S.Ct. 1364].) Under *Wheeler*, of course, which is based on the right to trial by a representative jury, a defendant need not be a member of the group to challenge its exclusion. (*Wheeler, supra*, 22 Cal.3d at p. 281.)

■ If a party believes an opponent is improperly using peremptory challenges for a discriminatory purpose, that party must make a timely objection and a prima facie showing that the jurors are being excluded on the basis of group bias. (*Wheeler, supra*, 22 Cal.3d at p. 280.) To establish a prima facie case, the moving party should first make as complete a record as possible; second, the moving party must establish that the persons excluded are members of a cognizable group; and third, the moving party must show a strong likelihood that the persons are being excluded because of group association. (*Ibid.*; see also *People* v. *Sanders* (1990) 51 Cal.3d 471, 497-498 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Snow* (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452]; *People* v. *Motton* (1985) 39 Cal.3d 596 [217 Cal.Rptr. 416, 704 P.2d 176]; *People* v. *Allen* (1979) 23 Cal.3d 286 [152 Cal.Rptr. 454, 590 P.2d 30].) Once the moving party has established a prima facie case, the burden shifts to the other party to come forward with a race-neutral explanation related to the particular case to be tried. (*Wheeler, supra*, 22 Cal.3d at pp. 281-282; *Batson* v. *Kentucky, supra*, 476 U.S. at pp. 96-98 [90 L.Ed.2d at pp. 87-89]; *People* v. *Johnson, supra*, 47 Cal.3d at p. 1216.)

■ This court and the high court have professed confidence in trial judges' ability to determine the sufficiency of the prosecutor's explanations. In *Wheeler*, we said that we will "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Wheeler, supra*, 22 Cal.3d at p. 282.) Similarly, the high court stated in *Batson* v. *Kentucky, supra*, that "the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility," and for that reason "a reviewing court ordinarily should give those findings great deference." (476 U.S. at p. 98, fn. 21 [90 L.Ed.2d at p. 89].)

In *People* v. *Johnson, supra*, we reemphasized the need for "a standard of truly giving great deference to the trial court in distinguishing bona fide reasons from sham excuses." (47 Cal.3d at p. 1221.) We disapproved the

approach taken earlier in *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719], in which we had disallowed subjective reasons for peremptory challenges and had engaged in a comparative analysis of various jurors' responses to evaluate the bona fides of the prosecutor's stated reasons. We disapproved the *Trevino* approach because nothing in *Wheeler* disallows reliance on the prospective jurors' body language or manner of answering questions as a basis for rebutting a prima facie case, and because comparative analysis of jurors unrealistically ignores "the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar." (47 Cal.3d at pp. 1219, 1220.)

We reaffirmed in *People* v. *Johnson, supra,* 47 Cal.3d 1194, however, that the trial court must make " 'a sincere and reasoned' " attempt to evaluate the prosecutor's justifications. (*Id.* at p. 1216, citing *People* v. *Hall, supra,* 35 Cal.3d 161, 167-168.) Furthermore, every questioned peremptory challenge must be justified: "If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted" and the court must dismiss the venire and begin jury selection anew. (*Wheeler, supra,* 22 Cal.3d at p. 282.) *Batson* has been interpreted to afford the same relief. "[U]nder *Batson,* the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." (*People* v. *Battle* (8th Cir. 1987) 836 F.2d 1084, 1086; see also *United States* v. *Gordon* (11th Cir. 1987) 817 F.2d 1538, 1541; *United States* v. *David* (11th Cir. 1986) 803 F.2d 1567, 1571; *People* v. *Gonzalez* (1989) 211 Cal.App.3d 1186, 1193 [259 Cal.Rptr. 870].)

*Prima Facie Case Finding.*

As noted, the procedure for challenging a party's use of peremptory challenges requires the moving party to make a timely objection and to establish a prima facie case to the court's satisfaction.

■■ Defendant contends that he made a timely objection after the prosecutor challenged the first four jurors, all of whom were Black. Defendant further contends that, when the trial court asked the prosecutor to respond, the court in effect found that a prima facie case had been made. Although the trial court deferred hearing the prosecutor's justifications, it noted: "Before we commence the trial, *I will have the reasons set forth by the People.*" Moreover, when voir dire concluded, the court instructed the

prosecutor to obtain his records and justify his challenges despite the prosecutor's claim that there was no prima facie case.

These statements by the trial court clearly indicate that the court had *implicitly* found a prima facie case of improper exclusion on the basis of race. That the trial court had moved beyond the required prima facie finding is further indicated by the court's comment to defense counsel that, "if I rule in your favor, I'd start over with a whole new panel." Only a ruling on the ultimate question of the adequacy of the prosecutor's justifications to rebut a prima facie showing would present the issue of remedy.

After finding a prima facie case of group bias, a trial court ordinarily proceeds by considering the prosecutor's justifications and then by ruling on their adequacy. In this case, however, the court appears to have confused these steps. After hearing the prosecutor's justifications, the court commented: "Well, in reviewing the cases, I find that I probably should have ruled on whether there was a prima facie showing that established a systematic exclusion. And I failed to do so. However, in reviewing the matter, I would indicate that I find that there was no prima facie showing that there was a systematic exclusion."[4] The court mentioned three factors to support its finding: (1) Defendant was not of the same race as the excluded jurors; (2) the trial jury, as finally constituted, included three Black jurors; and (3) no discrimination was evident in the manner and thoroughness of the voir dire.

The People contend that the trial court's express finding of no prima facie showing effectively disposes of the *Wheeler* issue. We disagree.

First, we have consistently held that when the trial court inquires about the prosecutor's justifications, as in this case, the court has made "at least an implied finding" of a prima facie showing. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1217; *People* v. *Turner, supra,* 42 Cal.3d at pp. 718-719; *People* v. *Hall, supra,* 35 Cal.3d at p. 165. See also *People* v. *Mason* (1991) 52 Cal.3d 909, 937 [277 Cal.Rptr. 166, 802 P.2d 950].)[5]

---

[4]We note that this court, and others, sometimes use the term "systematic exclusion" to describe a discriminatory use of peremptory challenges. The term is not apposite in the *Wheeler* context, for a single discriminatory exclusion may violate a defendant's right to a representative jury. The term more properly refers to underrepresentation in the venires from which juries are selected, in the context of *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664].

[5]We reiterate our concern, expressed in *Turner* (*supra,* 42 Cal.3d at p. 719, fn. 3) and in *Mason* (*supra,* 52 Cal.3d at p. 937, fn. 7), that rulings by implication may confuse the parties as to their respective obligations under *Wheeler.*

When a *Wheeler* motion is made, the party opposing the motion should be given an opportunity to respond to the motion, i.e., to argue that no prima facie case has been made. At

The prosecutor in this case evidently understood the court's inquiry as an implied finding, for he stated he was unprepared to give his "reasons" when the *Wheeler* objection was first made.

 Second, there is authority for the proposition that once the trial court has ruled, expressly or by implication, that a prima facie case has been made and that the burden has shifted to the prosecution, the court may not then "return to the screening process. The sole issue then pending is the adequacy of the justifications." (*People* v. *Granillo* (1987) 197 Cal.App.3d 110, 122 [242 Cal.Rptr. 639]; see also *People* v. *Gonzalez, supra,* 211 Cal.App.3d 1186, 1198.)

The United States Supreme Court reached the same conclusion in the context of motions under *Batson* v. *Kentucky, supra,* 476 U.S. 79. In *Hernandez* v. *New York* (1991) 500 U.S. ___ [114 L.Ed.2d 395, 111 S.Ct. 1859], the court found the lack of a ruling on the threshold issue irrelevant when a prosecutor had explained his use of peremptory challenges without prompting or inquiry by the trial court, and when the court had actually considered the explanations. Under those circumstances, the trial court had no occasion to decide whether the defendant had met the prima facie showing requirement. Thus, the absence of a finding on the threshold showing did not affect review. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Id.* at p. ___ [114 L.Ed.2d at p. 405].)

Accordingly, we proceed to the court's evaluation of the prosecutor's justifications for his peremptory challenges.

---

this point no explanation for the exercise of the peremptory challenges need be given. After argument, the trial court should *expressly* rule on whether a prima facie showing has been made. Statements by the court such as "do you wish to respond?" or "do you want to explain?" do not clearly indicate whether the court wants argument on the existence of a prima facie case, or whether the court has already found a prima facie case and now wants to hear the prosecutor's explanations. The parties should not be required to guess as to what the court has or has not ruled with respect to the motion. Justifications for the challenged peremptories need only be given if the court rules that a prima facie case does exist. In ruling on a *Wheeler* motion, therefore, the trial court should in every instance make an express determination whether or not the prima facie showing requirement has been met.

We also reemphasize the trial court's role in making an adequate record when dealing with a *Wheeler* motion. Notwithstanding the deference we give to a trial court's determinations of credibility and sincerity, we can only do so when the court has clearly expressed its findings and rulings and the bases therefor.

*The Trial Court's Evaluation of the Prosecutor's Reasons.*

 The trial court's responsibilities in this phase of a *Wheeler* motion are set out in *People* v. *Hall, supra,* 35 Cal.3d 161, 167-168: "[I]t is imperative, if the constitutional guarantee is to have real meaning, that once a prima facie case of group bias appears the allegedly offending party be required to come forward with [an] explanation to the court that demonstrates other bases for the challenges, *and* that the court satisfy itself that the explanation is genuine. This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ."

In *People* v. *Hall, supra,* 35 Cal.3d 161, we concluded that the trial court had made *no* serious attempt to evaluate the bona fides of the prosecutor's explanations. (35 Cal.3d at p. 168.) In this case, as we shall explain, the trial court did make some effort to evaluate the prosecutor's explanations, but the court evaluated them only in the abstract. The court did not determine whether the "bona fide" or the "sham" reasons actually applied to particular challenged jurors. For this reason, the trial court did not satisfy its *Wheeler* obligation of inquiry and evaluation, and the judgment must therefore be reversed.

The prosecutor stated his reasons for challenging each of the 14 prospective Black jurors at length, referring to answers in the questionnaires and reading from the transcript of the voir dire. Unlike the trial court in *Hall*, there is no indication that the court in this case considered itself bound to accept the prosecutor's explanations at face value. The court found some of the stated reasons genuine ("good") and some false ("spurious") and indicated which were which, but the court failed to consider which of the valid reasons applied to which jurors.

Moreover, review of defendant's *Wheeler* claim has been made difficult by the court's failure to ask for justifications until the conclusion of voir dire. The large number of challenges exercised, combined with the large number of reasons given for challenging each prospective juror, compounded the trial court's task. The trial court itself perceived this problem, noting that the time lapse between the examinations and the prosecutor's justifications ("three or four weeks") presented problems of recall.[6] As will appear, the

---

[6]The court noted, somewhat inartfully, that "the People being—at least should be—very conscious of this particular issue and should have made notes at the time to justify exclusion,

end result was that the trial court did not, and perhaps could not, evaluate the prosecutor's explanations as to *individual* jurors. Instead, the court made a global ruling as to which of the prosecutor's reasons were neutral, and therefore proper. However, the court erroneously failed to relate its findings to particular challenged jurors except in the case of a single alternate juror whose responses raised a question as to his honesty.

To illustrate, the trial court found "totally unreasonable" one of the prosecutor's reasons for excusing many of the Black jurors, namely their having answered "no" to a series of questions (Nos. 94 through 97) regarding their attitudes towards the death penalty.[7] The court found this reason invalid "not only from the fact that the answer 'no' probably is the proper answer to each of those questions for any juror, but secondly because [the prosecutor] left, as I count, more than half of the remaining jurors there in the box who also answered 'no' to all those questions. So that can't be a basic reason for his exclusion."

Regarding the myriad other reasons that the prosecutor offered to explain his exclusions, the court said: "I also recognize that the People were using kind of a *shotgun approach* to the reasoning [justification] process, *hoping that something would fly* . . . would shoot down a good excuse somewhere down the line." (Italics added.) Indeed, on numerous occasions the prosecutor cited as a justification for excusing a particular juror the nature of the juror's employment, recreational choices, or choice of reading material. The prosecutor also pointed out that the excluded jurors were unfamiliar with the

---

particularly at the time when they knew that they were probably going to exclude them, which I gather he did at some point earlier than coming into court yesterday."

In fact, there is no indication in the record that the prosecutor made notes, other than the "yes/no" referred to earlier, or that he was reading from anything other than the transcript and the questionnaires in justifying his challenge of particular jurors.

Contemporaneous notes by the prosecutor as to the reasons for peremptory challenges may prove to be indispensable to the *Wheeler* process. We also encourage the trial courts to make whatever notations are feasible when jurors are being examined.

[7]Question No. 94: "Do you believe the state should impose the death penalty on everyone who, for whatever reason, kills another human being?"

Question Nos. 95 through 97 were apparently drafted in response to *Fuentes I, supra,* 40 Cal.3d 629, and *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862]:

Question No. 95: "Do you believe the state should impose the death penalty on everyone who kills another human being, whether or not he had the *intent* to kill?" (Italics added.)

Question No. 96: "Do you feel that the state should put to death anyone who kills another human being during the commission of a felony, namely a robbery or attempted robbery, whether or not he had the *intent* to kill?" (Italics added.)

Question No. 97: "Do you feel the state should put to death anyone who participates in the commission of a felony, namely a robbery or attempted robbery, which results in the death of a human being?" (Many prospective jurors left blanks on this question; only one answered "yes.")

meaning of words, including legal terms with which the juror had no experience; he noted that some of the jurors left certain questions in the questionnaire blank, that they gave ungrammatical answers, or that they misspelled words in their response to the questionnaire.[8] The prosecutor did not articulate how these failings related to jury service in this case. The trial court understandably found such reasons "very spurious."

The trial court nevertheless found three "good reasons" for the prosecutor's excusals. The court stated: "I feel that there were good reasons for excusing the jurors that were excused. Those that had been arrested or relatives been arrested, I think in reading the cases the courts have indicated that's a proper reason. . . . And I thought that some of the jurors with their leanings against the death penalty, in this type of a case, that is a proper excuse." Except for the single juror whose answers seemed to suggest dishonesty, the trial court accepted no other reasons for challenge as valid.

In summary, the trial court took the first step in the evaluation process. It determined which of the myriad justifications cited by the prosecutor were sham and which were bona fide. However, a truly "reasoned attempt" to evaluate the prosecutor's explanations (*People* v. *Hall, supra,* 35 Cal.3d at pp. 167-168) requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge.

We reiterate that the trial court is in the best position to determine whether a given explanation is genuine or sham. For that reason, we continue to accord great deference to the trial court's ruling that a particular reason is

---

[8]We question the propriety and value of a questionnaire as extensive as that used in this case. While there is statutory authority for the use of questionnaires, either on the court's own motion or as proposed by counsel (Code Civ. Proc., § 205, subds. (c) & (d)), the questionnaire must be relevant and necessary for assisting in the voir dire process. Jurors in this case were questioned, among other things, about their understanding of legal terminology and principles. Many of the jurors had no prior jury experience and, without the guidance of the court, could only guess at the proper answers. We understand that the Judicial Council of California is studying the feasibility of uniform or standard juror questionnaire forms. Some sort of uniformity in this area would avoid some of the problems encountered in this case. It is also significant that section 7 of Proposition 115 (eff. June 6, 1990) has placed restrictions on the scope of voir dire. Code of Civil Procedure section 223, as amended by Proposition 115, provides that the "[e]xamination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause." Standard juror questionnaires should materially assist the implementation of section 7 of Proposition 115.

genuine. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1221.) In this case, however, the trial court failed to take the next, necessary step of asking whether the asserted reasons actually applied to the particular jurors whom the prosecutor challenged. For this reason, we are compelled to reverse the judgment of death. Our conclusion makes it unnecessary to reach defendant's remaining contentions.

Accordingly, the special circumstance finding is set aside, and the judgment imposing a penalty of death is reversed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring.—I concur in the judgment. In my view, the majority soundly conclude that the judgment of death must be reversed.

I write separately to clarify what I believe to be the fundamental basis of our decision.

In *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748], we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership or bias violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83, 106 S.Ct. 1712], and its progeny, the United States Supreme Court held that such a practice also violates the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

Blacks, of course, are a cognizable group for purposes of both *Wheeler* (22 Cal.3d at p. 280, fn. 26) and *Batson* (476 U.S. at pp. 84-89 [90 L.Ed.2d at pp. 79-83]).

Under *Wheeler,* there is a presumption that a prosecutor uses peremptory challenges in a constitutional manner. (22 Cal.3d at p. 278.) The defendant bears the burden to show, prima facie, the presence of invidious discrimination. (*Id.* at p. 280.) If he succeeds, the burden shifts to the prosecutor to show its absence. (*Id.* at p. 281.) If the prosecutor fails, the defendant's prima facie showing becomes conclusive. (See *id.* at p. 282.) In such a situation, the presumption of constitutionality is rebutted. (*Ibid.*) Substantially the same principles apply under *Batson.* (See 476 U.S. at pp. 89-98 [90 L.Ed.2d at pp. 82-89].)

In this case, we are required to conclude that the prosecutor peremptorily challenged Black prospective jurors on the basis of group membership or bias in violation of the United States and California Constitutions. Defendant carried his burden. The prosecutor did not.

In reversing the judgment, I join the majority in finding fault with the procedural deficiencies of the trial court. Indeed, on this record I cannot do otherwise.

Nevertheless, I believe that we must place the ultimate blame on its real source—the prosecutor. It was he who unconstitutionally struck Black prospective jurors. The record compels this conclusion and permits none other. This was no "technical" or inadvertent violation. This prosecutor *knew* that such conduct was altogether improper. The trial court told him as much. And so did we. Only a few months earlier, in *People* v. *Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102], this court attempted to teach this same prosecutor that invidious discrimination was unacceptable when we reversed a judgment of death because of similar improper conduct on his part. He failed—or refused—to learn his lesson. The result is another reversal—and another costly burden on the administration of justice.[1]

For the foregoing reasons, I agree with the majority that the judgment of death must be reversed.

---

[1] I note in passing that I share the majority's doubt about the propriety and value of a questionnaire for prospective jurors as extensive as that used in this case. Particularly unreasonable and offensive are interrogatories probing the subject's religious practices and beliefs. Henceforth, such questions should not appear.