[No. B152420. Second Dist., Div. Seven. Dec. 18, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN M. McGEE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2 through 5 of the Discussion.

**COUNSEL**

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and Myung J. Park, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PERLUSS, J.**—Brian M. McGee appeals from his conviction after a jury trial for one count of murder and one count of attempted murder, arguing the trial court erred in considering his several motions under *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69] (*Batson*), which alleged the prosecutor was improperly discriminating in the exercise of peremptory challenges. McGee also contests several of the trial court's evidentiary rulings.

We reject McGee's evidentiary claims. However, we conclude the trial court failed to follow required procedures for determining whether the prosecutor had improperly excused African-American prospective jurors on the basis of group bias and remand for a new *Wheeler* hearing.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The December 3, 1998 Shootings*

McGee (sometimes known as Geeter) lived in an apartment in the Nickerson Gardens housing project in Los Angeles with Linda Williams and Jonathan Bowen. Williams was dating Lee Anthony Lewis, who lived nearby with his mother.

On the evening of December 3, 1998, Lewis went to the apartment to see Williams. McGee answered the door, told Lewis to go away and closed the door. Lewis did not leave and instead tried to get Williams's attention by

shouting at her window. McGee and two friends, Charlie Mack and Larry Hamilton, then came out of the apartment and attacked Lewis for "disrespecting" them. During the assault, Mack hit Lewis in the mouth with a handgun. McGee threatened Lewis not go to the police "or he would kill him."

Williams heard the commotion and went outside to see Lewis. McGee and Mack forced her back into the apartment. Mack pointed the gun at her and said " 'If you or your boyfriend go and tell the police, or call the police, we're going to kill you.' " McGee repeated the threat to Williams, who ran out of the apartment in search of Lewis.

Williams found Lewis down the street talking to the police. After Lewis reported the incident, the police escorted Lewis and Williams back to the apartment, where Lewis identified Mack and Hamilton as two of the attackers. Mack and Hamilton were placed under arrest.

The police then accompanied Williams and Lewis to Lewis's house. Williams noticed McGee's uncle, George Adams, watching from a nearby corner. After the police departed, Adams knocked on the door. When Lewis answered, Adams said, " 'Lee Anthony, man, you should have just left it alone' " and " 'should have taken it like a man.' "

Seconds after Adams left, McGee burst into the Lewis residence and began shooting. After the shooting stopped, Williams told Lewis's mother, " 'Geeter shot us, Geeter shot us.' " When the police arrived, both Williams and Lewis told the officers they had been shot by McGee.

Lewis died of multiple gunshot wounds to the chest and buttocks. Although she had been shot seven times, Williams survived and testified at trial.

### 2. The Charges Against McGee

McGee was charged with one count of murder (Pen. Code, § 187), one count of attempted premeditated murder (Pen. Code, §§ 664, 187) and one count of making terrorist threats (Pen. Code, § 422). The information specially alleged Lewis had been intentionally killed because he was a witness to a crime (Pen. Code, § 190.2, subd. (a)(10)). It also alleged that McGee personally used and discharged a handgun (Pen. Code, §§ 12022.5, subd.

(a)(1), 12022.53, subds. (b) & (c)), which caused great bodily injury and death (Pen. Code, § 12022.53, subd. (d)). The information further alleged McGee had personally inflicted great bodily injury on Williams in the commission of the attempted murder alleged in count 2 (Pen. Code, § 12022.7, subd. (a)). Finally, the information alleged all crimes were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).

### 3. *Voir Dire and McGee's Wheeler Motions*

The case was tried to a jury. During jury selection McGee's counsel made a series of four motions under *Wheeler* and *Batson,* each of which was denied.

The trial court denied McGee's initial motion, finding he had failed to establish a prima facie case of improper discrimination:

"MR. HAIG: Your Honor, there would be a defense motion for a declaration of mistrial and to bring up a new panel based on *People v. Wheeler* and *Batson v. Kent[ucky].*

"The defense allegation [is] that the People have used their peremptory challenges in a self-incriminatory fashion and they have exercised six peremptory challenges and of those six peremptory challenges five of them have been more African-Americans, and the record should reflect that my client is African-American, and I believe that the prima facie showing has been made to show there is a discriminatory use of the peremptory challenges in this case. . . ."

The trial court denied the motion, stating, "I don't believe you've made a prima facie case."

Jury selection continued, and the prosecutor excused Juror No. 3. McGee's counsel again challenged the prosecutor's use of peremptory challenges:

"MR. HAIG: Your Honor, I would again renew the motion under *Wheeler, People v. Wheeler* and *Batson v. Kentucky.* The last juror that was excused by the People was African-American so he's exercised seven peremptory challenges. Just so the record is clear, six have been against African-Americans,

one has been of a female Hispanic. So I would ask especially since my client is African-American that the People—that a prima facie showing has been made the People are using their peremptory challenges in a discriminatory fashion. I ask the court to ask the People to state a reason for each one of the peremptory challenges.

"THE COURT: Okay. I'm not sure there's a prima facie case as to all the peremptories but as to the last one I believe there is a prima facie case.

"MR. HAIG: If the court does find a prima facie showing that means there has been a pattern, whether it is insidious or not, is for the court for determine; and I don't think it is but I think here's enough for a prima facie showing, and I think that the court—any reviewing court's going to want to know the reasons for each one of the strikes [not] just the last one.

"And the reason I say that is that this court or reviewing court if it determines that any or all of the strikes for any of the African-American jurors is invalid, say that the recommendation is a mistrial and bringing of a new panel, so I would ask and I am just asking this for the court's and for the record that the People be asked to furnish a reason for each of the strikes of the African-American jurors and that is just my request. If the court doesn't want to employ it that way, that's fine.

"THE COURT: No. I didn't find a prima facie case the first time you made it. I do now and that's as a result of the last challenge. So at this time the ball's in Mr. Nunez's court."

The prosecutor then explained that during his six years as a prosecutor, he has "had problems with teachers and mail carriers" resulting in hung juries, and Juror No. 3 was a postal worker. He also stated that "I believe that there was some sort of reluctance or holding back on her part in terms of opening up and asking [sic] the questions that I think that are important in a case of this magnitude to be answered."

The trial court responded: "You know, it's hard to put your finger on it but, you know, I got the same impression. You know, I don't know. It was just a feeling on my part that she was reluctant to open up, as we say; and I understand your theory as far as postal workers are concerned. It's a theory shared by many prosecutors. I think Mr. Haig may be just as aware of that as you are and that the court is. All right. I'll accept it."

McGee's third motion was made after the prosecutor exercised two more peremptory challenges against African-American jurors. At that point, the prosecutor had exercised eight out of nine peremptory challenges against African-Americans. McGee's counsel argued, "I believe that not only established a pattern but shows that the People are using their peremptory challenges in a discriminatory way." The trial court denied the motion, finding McGee had failed to make a prima facie showing the prosecutor had used the peremptory challenges because of race or other group bias.

During the selection of alternate jurors, the prosecutor struck two additional African-American jurors without asking them any individual voir dire questions. McGee's counsel renewed his *Wheeler* motion, arguing, "All but two of the strikes by the People have been for African-Americans and in the—the last juror I think establishes, again, a pattern that the peremptories are being utilized in a discriminatory fashion." The court once again found no prima facie showing, but nonetheless invited comment from the prosecutor. The prosecutor explained the last juror had been excused because she had several close relatives in prison. The court said "okay" and proceeded to complete jury selection.

### 4. Sentence, Judgment and Appeal

The jury ultimately selected and sworn convicted McGee of murder and attempted murder, acquitted him of making terrorist threats and found true all the special allegations. He was sentenced to life in prison without the possibility of parole plus a consecutive sentence of 25 years to life on the murder count. He received a concurrent sentence of life imprisonment plus 25 years to life for the attempted murder conviction. McGee was ordered to pay a $10,000 restitution fine and a $10,000 parole revocation fine, which was stayed.

McGee filed a timely notice of appeal.

### CONTENTIONS

McGee contends the trial court erred in ruling on his four *Wheeler* motions by (a) failing to find a prima facie case of race-based exclusion with respect to his first motion; (b) having found a prima face case with respect to his second *Wheeler* motion, failing to inquire into the reasons for *all* peremptory challenges to African-American jurors up to that point; and (c) failing to find a prima facie case with respect to his third and fourth *Wheeler* motions.

McGee also contends the trial court erred by admitting the out-of-court statements of George Adams, denying his motion to introduce evidence to impeach a prosecution witness, giving CALJIC No. 17.41.1 and imposing the parole revocation fine.

## DISCUSSION

### 1. *The Case Must Be Remanded for a Full Hearing on McGee's Wheeler Motions*

#### a. *Standard of Review*

█ Peremptory challenges may not be used to exclude prospective jurors solely on the basis of a presumed group bias based on membership in a racial group. (*Wheeler, supra,* 22 Cal.3d at pp. 276-277; *Batson, supra,* 476 U.S. at p. 89 [106 S.Ct. at p. 1719].) Under *Wheeler* and *Batson,* " '[i]f a party believes his [or her] opponent is using his [or her] peremptory challenges to strike jurors on the ground of group bias alone, he [or she] must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First . . . he [or she] should make as complete a record of the circumstances as is feasible. Second, he [or she] must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he [or she] must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias.' [Citations.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1153-1154 [5 Cal.Rptr.2d 268, 824 P.2d 1315], italics omitted.) In this context, "in California, a 'strong likelihood' means a 'reasonable inference.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1188, fn. 7 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

█ Upon a timely challenge under *Wheeler* the trial court is obligated to make an express finding whether the moving party has demonstrated a prima facie case. (*People v. Turner* (1986) 42 Cal.3d 711, 719, fn. 3 [230 Cal.Rptr. 656, 726 P.2d 102]; *People v. Snow* (1987) 44 Cal.3d 216, 227 [242 Cal.Rptr. 477, 746 P.2d 452].) █ If the court concludes no prima facie case has been established, we consider the entire record of voir dire in reviewing its denial of the motion. (*People v. Howard, supra,* 1 Cal.4th at p. 1155.) "As with other findings of fact, we examine the record for evidence to support the trial court's ruling. Because *Wheeler* motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citations.]" (*Ibid.*)

 If a prima facie case is found, the party exercising the peremptory challenges must provide a group-neutral reason for each challenge. (*People v. McDermott* (2002) 28 Cal.4th 946, 970 [123 Cal.Rptr.2d 654, 51 P.3d 874].) " 'If a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*People v. Silva* (2001) 25 Cal.4th 345, 384 [106 Cal.Rptr.2d 93, 21 P.3d 769].) "This demands of the trial judge a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . ." (*People v. Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854].) "[A] truly 'reasoned attempt' to evaluate the prosecutor's explanations [citation] requires the court to address the challenged jurors individually to determine whether any one of them has been improperly excluded. In that process, the trial court must determine not only that a valid reason existed but also that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75].) "Preferably, in ruling on a *Wheeler* motion, the trial court should state expressly its determination as to the adequacy of the justification proffered with respect to each peremptory challenge." (*People v. Sims* (1993) 5 Cal.4th 405, 431 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

The trial court's ruling on this issue is reviewed for substantial evidence. (*People v. Howard, supra*, 1 Cal.4th at p. 1155.) However, "we apply this deferential standard of review only when 'the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror.' [Citations.]" (*People v. McDermott, supra*, 28 Cal.4th at p. 970.)

 b. *The Trial Court Erred in Failing to Inquire into the Prosecutor's Reasons for the Prosecutor's First Five Peremptory Challenges of African-American Prospective Jurors*

 After the trial court denied McGee's initial *Wheeler* motion, which had been directed to the prosecutor's peremptory challenges to five African-Americans,[1] the prosecutor excused a sixth African-American prospective juror; and McGee renewed his *Wheeler* motion, arguing the prosecutor's use

---

[1] Whether the trial court properly concluded McGee had not made a prima facie showing of race-based exclusions on his first *Wheeler* motion is moot in light of our holding that the court

of six of his first seven peremptory challenges to reject African-Americans demonstrated a pattern of race-based exclusion. The trial court agreed that a prima facie showing of impermissible discrimination had been made under *Wheeler* and *Batson*, but then erroneously limited that finding—and the concomitant requirement that the prosecutor provide a race-neutral explanation for the peremptory challenge—to. the most recent juror who had been excused, Juror No. 3.

*Wheeler* and *Batson* protect a defendant's constitutional right to be tried by a representative jury. A *Wheeler* motion challenges the selection of a jury, not the rejection of an individual juror; the issue is whether a pattern of systematic exclusion exists. (*People v. Gore* (1993) 18 Cal.App.4th 692, 705 [22 Cal.Rptr.2d 435].) Accordingly, once the trial court has found a prima facie case of improper use of peremptory challenges to exclude jurors based on perceived group bias, the burden shifts to the prosecutor to provide race-neutral explanations for *all* challenges involved and for the court to evaluate the prosecutor's explanation in light of the circumstances of the case as then known. (*People v. Fuentes, supra,* 54 Cal.3d at p. 715 ["every questioned peremptory challenge must be justified"]; *People v. Gray* (2001) 87 Cal.App.4th 781, 789-790 [104 Cal.Rptr.2d 848] [based on "facts showing no apparent reason to exclude at least one of the three potential jurors other than his status as an African-American male," prosecutor should have been asked to "explain[] why he excluded every African-American male juror"]; *Gore,* at p. 705 ["trial court should have considered the motion as to all seven challenged Hispanic prospective jurors"].)

In *People v. Gore, supra,* 18 Cal.App.4th 692, the defendant first raised a *Wheeler* challenge asserting the prosecutor was systematically excluding Hispanics during the selection of alternate jurors, after 12 jurors had been seated and sworn. (*Id.* at p. 697.) In making his prima facie showing, the defendant discussed four Hispanic prospective jurors who had been excused during the initial phase of jury selection, as well as the prosecutor's challenge of three Hispanic prospective alternate jurors. (*Ibid.*) The Court of Appeal reversed the trial court's ruling that the motion was timely only as to the prospective alternate jurors. (*Id.* at pp. 703-705.) Although *Gore's* procedural posture differs significantly from ours, the court's rationale for requiring the trial court to inquire into all peremptory challenges of Hispanics preceding the motion is fully applicable here: "When the trial court rules on a *Wheeler* motion, it should look to the totality of the relevant facts and should consider all the relevant circumstances. . . . [¶] . . . [T]he trial

---

erred in failing to require the prosecutor to explain all his peremptory challenges to African-American prospective jurors on the second motion.

court should have considered the motion as to all seven challenged Hispanic prospective jurors and not limited its inquiry to only the alternate juror selection process. To hold otherwise would be to allow a potential prima facie pattern of systematic exclusion to go unchallenged." (*Id.* at p. 705.)

■ Because the trial court short-circuited the proper procedure for a *Wheeler* motion, we cannot decide whether the prosecutor did in fact improperly exercise his peremptory challenges against African-American prospective jurors. Although the parties' appellate briefs discuss at length the characteristics of the jurors who were seated compared to those who were excused by the prosecutor, we cannot rule on the validity of the prosecutor's peremptory challenges because, with the exception of juror number three, we have no idea what actually motivated them. In ruling on a *Wheeler* motion "the trial court must determine not only that a valid reason existed but that the reason actually prompted the prosecutor's exercise of the particular peremptory challenge." (*People v. Fuentes, supra,* 54 Cal.3d at p. 720.) Although the People's appellate brief has provided any number of reasons that might possibly have motivated the prosecutor in making his challenges, such conjecture does not substitute for the second step of the *Wheeler* analysis—the prosecutor's explanation of the factors he *actually* relied upon in exercising his peremptory challenges.

In prior cases in which the trial court's *Wheeler* analysis was incomplete, the appellate courts have utilized a limited remand to permit the prosecutor to explain his or her reasons for excluding the prospective jurors in question and to permit the trial court to conduct the required "sincere and reasoned" evaluation of the prosecutor's explanation in light of all the circumstances of the case. (*People v. Rodriguez* (1996) 50 Cal.App.4th 1013, 1024-1025 [58 Cal.Rptr.2d 108]; *People v. Snow, supra,* 44 Cal.3d at pp. 226-227.) This remedy is appropriate here. On remand the trial court must determine not only that race-neutral grounds to challenge an African-American prospective juror exist in the abstract, but also that the prosecutor's statement that he *relied* on those grounds is credible.[2] (*People v. Tapia* (1994) 25 Cal.App.4th 984, 1013-1014 [30 Cal.Rptr.2d 851].) If reasonable grounds exist to justify a challenge, but the trial court does not believe those grounds *in fact*

---

[2]We do not question the trial court's finding that the prosecutor's explanation for his challenge to juror number three was credible. However, on remand the trial court must reevaluate that explanation in light of the reasons proffered for the rejection of the other African-American prospective jurors. An explanation that seems credible in isolation may appear pretextual when viewed against a pattern of race-based exclusion of jurors.

motivated the prosecutor, the *Wheeler* motion must be granted and a new jury impaneled. (*Ibid.*)[3]

 c. *The Trial Court Must Reconsider Its Finding of No Prima Facie Showing with Respect to McGee's Third and Fourth Wheeler Motions*

█ *Wheeler* motions may be made sequentially, as was done in the instant case. However, as to each successive motion, the objecting party retains the initial burden to establish a prima facie case—that is, to raise a reasonable inference that the opposing party has challenged jurors because of their race or other group association. (*People v. McDermott, supra*, 28 Cal.4th at pp. 969-970; *People v. Irvin* (1996) 46 Cal.App.4th 1340, 1351 [54 Cal.Rptr.2d 450].) "[O]nce a prima facie showing has been refuted, it is incumbent on the moving party to make a new prima facie showing with regard to any subsequent *Wheeler* motion pertaining to different jurors of the identified group from the venire. Subsequent *Wheeler* motions, however, may be based on evidence presented in prior *Wheeler* motions, to the extent necessary to establish a discriminatory pattern of peremptory challenges. [Citation.]" (*Irvin*, at pp. 1351-1362.)

█ McGee's third *Wheeler* motion was made after the prosecutor exercised two more peremptory challenges against African-American prospective jurors. At that point, the prosecutor had exercised eight of nine peremptory challenges against African-Americans. Because the trial court had erred in failing to obtain explanations from the prosecutor for all of the peremptory challenges at issue in McGee's second *Wheeler* motion, however, McGee was unable to support the new motion with evidence that should have been in the record and that may have established a discriminatory pattern of peremptory challenges. (*People v. Irvin, supra*, 46 Cal.App.4th at p. 1353 [court properly considers prosecutor's explanations rebutting prima facie showing on prior motion in determining whether prima facie showing has been made with respect to new, subsequent challenges to different jurors of that group].) Similarly, by erroneously limiting its inquiry on the second motion, the trial court failed to consider "the entire record of

---

[3]If the trial court concludes the passage of time makes it impossible for the prosecutor to explain his reasons for the challenges at issue or for the court to adequately evaluate those reasons, the judgment must be reversed and a new trial granted. (See *People v. Snow, supra*, 44 Cal.3d at pp. 226-227 [reversal of judgment and new trial required when prosecutor and trial court are unlikely to have sufficient recollection of voir dire proceedings to permit adequate explanation of challenges by prosecutor and evaluation of explanation by trial court]; *People v. Williams* (2000) 78 Cal.App.4th 1118, 1130 [93 Cal.Rptr.2d 356] [on remand, trial court must initially determine whether it can adequately address *Wheeler* issues].)

voir dire" in finding no prima facie showing had been made on the third motion. (See *People v. Howard, supra,* 1 Cal.4th at p. 1155.) The trial court improperly focused its analysis on the particular prospective jurors whose challenges prompted each motion, rather than evaluating whether McGee had raised a reasonable inference of a discriminatory *pattern* of conduct.

During the selection of alternate jurors, the prosecutor struck two additional African-Americans without asking any individual voir dire questions. McGee's fourth *Wheeler* motion was also denied by the trial court, once again based on the absence of a prima facie case of discrimination. As with McGee's third *Wheeler* motion, because it improperly limited its inquiry on the second motion, the trial court failed to consider the entire record of voir dire in finding no prima facie showing had been made as to his fourth motion.

Remand for the trial court to reconsider both the third and fourth motions, if the second motion is not granted on remand, is the appropriate remedy for these procedural errors in applying *Wheeler. (People v. Rodriguez, supra,* 50 Cal.App.4th at pp. 1024-1025; *People v. Snow, supra,* 44 Cal.3d at pp. 226-227.)

2.-5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed, and the matter is remanded to allow the trial court to conduct a new hearing on the *Wheeler* issues. Initially, the court must determine whether it can adequately address the issues at this stage. If not, a retrial is required. If the court can address the issues, it must first consider the exclusion of all six African-American prospective jurors included in McGee's second *Wheeler* motion and determine whether the prosecutor's reasons for excusing each of those jurors are constitutionally valid. If the court determines the prosecutor's reasons for excusing the six jurors are constitutionally valid, it must then address, seriatim, the issue whether a prima facie case has been established as to the third motion and, if so, whether the prosecutor's explanations for exercising the challenges are constitutionally valid, and then address those same issues as to the fourth motion.

*See footnote, *ante,* page 559.

If the trial court grants any of McGee's *Wheeler* motions, retrial is required. If the court denies all *Wheeler* motions after the hearing, the judgment shall be reinstated and corrected to delete the parole revocation fine.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied January 7, 2003, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 26, 2003. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.