Filed 9/12/13  P. v. Saxon CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054593 |
| v. | (Super.Ct.Nos. PEF005081, RIF137090) |
| CUTRENIA SAXON, | |
| Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.

Affirmed.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2006 and 2007, defendant Cutrenia Saxon convinced five people to disclose their Social Security numbers and other pertinent personal information to her by posing as a loan broker who could help them refinance their homes or buy new homes. After these transactions fell through or the potential buyers backed out of the transactions, defendant continued with the loan process by submitting false loan applications and obtained the loans. Forged deeds of trust on the properties were filed as collateral for the loans. Defendant set up a corporation that she used to wire money from the loans. During the time she obtained these proceeds, she did not file tax returns reporting this income.

Defendant was found guilty of numerous counts of identity theft, grand theft by false pretenses against several lending institutions, recording fraudulent trust deeds, money laundering, and tax evasion.

Defendant contends on appeal as follows:

1.      The trial court erred in denying her motion under *Batson v. Kentucky* (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) based on the prosecutor's exercise of a peremptory challenge to excuse a female African-American prospective juror and denying her mistrial motions based on the prosecutor's racially charged questions during voir dire in front of the entire panel.

2.	Her sentences for laundering of money under Penal Code section 186.10, subdivision (a) [1] should have been stayed pursuant to section 654.

We affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.	*Crimes Against Celena Salazar* (*Counts 1-5*)

In 2005, Celena Salazar's mother's home was facing foreclosure. Salazar's cousin referred her to a friend, claiming he could help Salazar. Salazar gave the friend all of her personal information. During this process, she spoke with defendant on the phone. Nonetheless, Salazar's mother's home went into foreclosure.

Sometime in 2006, Salazar received calls from a bank for past due mortgage payments for a property located at 23911 Via Alisol in Murrieta (Via Alisol). Salazar never signed loan documents for the property. Her signature on the documents was forged. Two trust deeds for security for the Via Alisol property were filed; one for $576,800 and another for $144, 200.

---

[1]	All further statutory references are to the Penal Code unless otherwise indicated.

[2]	We will only briefly recite the facts of this voluminous case along with the procedural background, as the facts of the case are minimally relevant to the issues raised on appeal.

In the escrow instructions, DRE Home Improvement (DRE) was to be paid $83,980 from the loan, purportedly for improvements to the home to be completed after the purchase. DRE was wired that amount on September 21, 2006. DRE was owned by defendant. The Via Alisol property was vacant after the sale.

Defendant admitted using Salazar's name and identifying information but claimed that it was a legitimate transaction. Defendant was arrested attempting to take $43,000 out of the DRE account.

For these actions, defendant was convicted of forgery (§ 470, subd. (b)) (count 1); grand theft by false pretenses for the loan (§ 487, subd. (a)) (count 2) with the enhancement that the value exceeded $150,000 (§ 12022.6, subd. (a)), i.e. a monetary enhancement; two counts of recording a false document for the first and second trust deeds on Via Alisol (§ 115) (counts 3 &4); and money laundering (§ 186.10, subd. (a)) for the wire transfer in the amount of $83,980 to DRE (count 5) with a monetary enhancement (§ 186.10, subd. (c)(1)(A)).

B.      *Crimes Against Kevin Crockett* (*Counts 7-10*)

During a search of defendant's vehicle on June 2, 2007, officers found documents regarding a $100,000 line of credit from National City Bank in Kevin Crockett's name, which was secured by a property located at 18713 Glass Mountain Street in Riverside (Glass Mountain). Defendant had a checkbook and credit cards in her purse for the line of credit.

On May 18, 2007, a $75,000 payout to DRE was made on this line of credit. Crockett did not write the check. Information on the documents to obtain the loan was false.

Defendant was Crockett's cousin-in-law. Crockett had sought defendant's help to buy a property and had given her all of his information. The sale never occurred, and he never gave permission for her to obtain a line of credit. He checked his credit when he found out defendant was arrested and discovered the unauthorized loans.

Defendant was convicted of identity theft (§ 530.5, subd. (a)) (count 7); forgery (§ 470, subd. (b)) (count 8); grand theft (§ 487, subd. (a)) for the money taken from National City (count 9) with monetary enhancement (§12022.6, subdivision (a)(1)); and money laundering (§ 186.10, subd. (a)) (count 10) for the $75,000 check to DRE.

C.     *Crimes Against Candice Grizzell* (*Counts 11-17*)

In the latter part of 2006, defendant offered to help Candice Grizzell and her husband (who was defendant's cousin) obtain a loan to purchase a residence in Moreno Valley. The transaction was cancelled, but Grizzell had given all of her personal information to defendant.

In 2007, Grizzell received notice from a bank for nonpayment of a loan for property located on Cape Cod Court in Yucaipa. Loan documents found in a storage facility belonging to defendant contained correct personal information for Grizzell, but she had not signed them, and the monthly income and employer were incorrect. There were two trust deeds filed on December 13, 2006, to secure the loan in the amounts of

5

$328,000 and $82,000. The escrow for the property showed that $70,228.77 was transferred to DRE on December 18, 2006.

Defendant was convicted of forgery (§ 470, subd. (b)) (count 11); grand theft (§ 487, subd. (a)) for the $328,000 trust deed (count 12) with a monetary enhancement (§ 12022.6, subd. (a)(2)); two counts of recording a false document (§ 115) for the two trust deeds (counts 13 & 15); grand theft (§ 487, subd. (a)) for the $82,000 trust deed (count 14) with a monetary enhancement (§ 12022.6, subd. (a)(1)); money laundering (§ 186.10, subd. (a)) for the wire transfer of $70,228.77 to DRE (count 16) with a monetary enhancement (§ 186.10, subd. (c)(1)(a)); and identity theft (§ 530.5, subd. (a)) (count 17).

D.    *Crimes Against Sterling Saintilus* (*Counts 18-21*)

During the search of the storage facility belonging to defendant, loan documents bearing Sterling Saintilus's name were found. They reflected a purchase of Glass Mountain.

Saintilus had never purchased the home or obtained a loan on the property. In 2005, Saintilus had given defendant his personal information in connection with a possible home purchase. However, Saintilus moved out of the state and never followed through with the purchase. Defendant went through with the purchase. She moved into the property. There was a trust deed filed in the amount of $796,000. All of the information on the loan documents was false.

6

For these actions, defendant was convicted of forgery (§470, subd. (b)) (count 18); grand theft by false pretenses (§ 487, subd. (a)) for the loan (count 19) with a monetary enhancement (§ 12022.6, subd. (a)); recording a false document (§ 115) for the trust deed on Glass Mountain (count 20); and identity theft (§ 530.5, subd. (a)) (count 21).

E.    *Crimes against Monique Vargas* (*Counts 22-23, 25-27*)

In December 2006, Monique Vargas received a notice that she was in default on a loan she never obtained.  During the search of the storage facility belonging to defendant, loan documents in Vargas's name were found for two residences:  45377 Saint Tisbury Street in Temecula (St. Tisbury) and 26492 Aloe Way in Murrieta (Aloe Way). Photocopies of Vargas's driver's license and Social Security card were in the storage facility.

In 2007, Vargas was shown the loan documents and denied signing any of them. The information on the loan documents was false.

There were two deeds of trust on Aloe Way.  There was $600,000 for a first trust deed and $150,000 for the second, for a total of $750,000.  There was a $632,000 deed of trust for St. Tisbury and another for $158,000.  On July 21, 2006, there was a wire transfer to DRE in the amount of $54,534.88 from the Aloe Way loan.  On June 16, 2006, there was a wire transfer from the St. Tisbury loan to DRE in the amount of $59,278.

Defendant was convicted of grand theft (§ 487, subd. (a)) for the St. Tisbury loan (count 22) with a monetary enhancement (§ 12022.6, subd. (a)(2)); money laundering (§ 186.10, subd. (a)) for the wire transfer of $59,278 to DRE (count 23) with a monetary

7

enhancement (§ 186.10, subd. (c)(1)(a)); grand theft (§ 487, subdivision (a)) for the Aloe Way loan (count 25) with a monetary enhancement (§ 12022.6, subd. (a)); recording a false document (§115) (count 26); and money laundering (§186.10, subd. (a)) for the wire transfer of $54, 534.88 to DRE (count 27) with a monetary enhancement (§ 186.10, subd. (c)(1)(a).

F.      *Remaining Convictions (Counts 29 & 30) and Sentence*

Defendant did not personally file state income taxes or on behalf of DRE in 2006 or 2007 despite an income of over $700,000.  Defendant was the owner of DRE. She was convicted of two counts of failing to file a tax return within the meaning of section 19706 (counts 29 & 30).  Defendant was also found guilty of an enhancement pursuant to section 186.11, subdivision (a)(2) that she had committed two or more felonies involving embezzlement exceeding $500,000.  She admitted that she had served three prior prison terms within the meaning of section 667.5, subdivision (b).

Defendant was found not guilty of one count of forgery and one count of identity theft in regard to Vargas (counts 24 & 28), and the jury was hung on count 6, a count involving Salazar, which was dismissed in the interest of justice under section 1385.

Defendant was sentenced to state prison for a total term of 26 years 8 months.  All of the money laundering sentences were imposed.

## II

## *BATSON/WHEELER* VIOLATION

Defendant contends the prosecutor violated *Batson/Wheeler* by peremptorily challenging and removing one prospective female African-American juror, Prospective Juror Thompson, from the jury panel.

Defendant additionally stated in the heading of her argument that the denial of the mistrial motion, as will be discussed in more detail, *post*, was error. However, defendant provides no legal authority or argument as to why the trial court should have granted a mistrial based on what she calls the prosecutor's "racially-charged" questions to the jury during voir dire. Although the People provided case law and statutory authority -- Code of Civil Procedure section 223 -- regarding voir dire in their responding brief, in her reply brief, again defendant provides only argument as to why the prosecutor's removal of Prospective Juror Thompson constituted *Batson/Wheeler* error. As such, we find she has forfeited her claim on appeal that the trial court's denial of a mistrial was error. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["'[w]hen a[] [defendant] fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived'"].) We address only whether the removal by the prosecutor of Prospective Juror Thompson constituted a *Batson/Wheeler* violation and refer to voir dire by the prosecutor as it was relevant to her removal.

"[O]ne accused of a crime has a constitutional right to a trial by impartial jurors. [Citations.]" (*In re Hitchings* (1993) 6 Cal.4th 97, 110.) "Both the California and United States Constitutions are violated by the exercise of peremptory challenges based on group bias, instead of reasons specific to the challenged prospective juror. [Citation.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 74.)

"The procedure governing objections on this ground is settled: 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.]'" (*People v. Lancaster*, *supra*, 41 Cal.4th at p. 74.)

"A prosecutor asked to explain his conduct must provide a '"clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) The trial court must then make a sincere and reasoned attempt to evaluate the explanation for each challenged juror in light of the circumstances of the case, trial techniques, examination of

10

prospective jurors, and exercise of peremptory challenges. (*People v. Fuentes* (1991) 54 Cal.3d 707, 718.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra,* at pp. 613-614, fn. omitted.)

Here, defendant disputes the prosecutor's removal of Prospective Juror Thompson. Prospective Juror Thompson stated that she lived in Moreno Valley. She was married and employed by Los Angeles County as an "Accounting 2." She had four children. One of her children lived with her, one worked at Target, another worked for the City of Riverside, and the fourth worked for the City of Highland as a bus driver. She had previously been on a civil jury where the case had settled prior to the verdict. No one in her family was in law enforcement, and she could be fair. Nothing about the civil case settling caused her to be less fair or impartial. Prospective Juror Thompson explained she worked in internal services responsible for maintenance for Los Angeles County.

11

Prospective Juror Thompson was asked by the prosecutor about her experience with loan brokers and real estate agents in buying a house and if she found they were a "bit less than truthful." She responded, "No. When we bought ours in '89, everything was good. The economy was good. We were still there. It increased $30,000. But at the time they looked truthful to me. I had no problems."

The prosecutor advised the jurors that it was going to ask questions in order to determine possible bias on the part of the jurors. The prosecutor noted that the jurors may not like some of the victims in the case and asked the jurors as a whole if they could set aside that bias. The prospective jurors must have responded in the affirmative. The prosecutor relayed that in some instances when prosecuting gang members the victim may become the defendant in the next case. The prosecutor asked if anyone felt that a gang member could not be a victim. The prosecutor then asked Prospective Juror Thompson this question directly, and she responded that a gang member was a human being and "has every right to be the victim." She also stated that someone should be punished for harming another.

The prosecutor then informed the jurors that he had reached the "most uncomfortable part of my jury voir dire." The prosecutor told a story about he and his father, who he described "looks very, very Mexican" and a border patrol agent singling his father out at an airport in El Paso, Texas. The prosecutor then asked "Now, is there anybody here that has heard from relatives or friend of friends or a friend that a police officer unfairly targeted them?" Apparently no one responded, and the prosecutor stated,

"You're an unusual group." Two jurors then stated that they had family members who had been targeted by police.

The prosecutor then stated, "Okay. We have before us a very attractive Black woman that we're prosecuting, and that of course raises the specter for us whether or not we have unfairly targeted a Black woman. It's a question that we have to ask. It's not a politically correct question. I understand that. But we need to know whether or not there's anybody here that might feel that Black people -- and if they are Hispanic, I'd be asking about Hispanics -- but are Black people unfairly targeted."

Prospective Juror Thompson responded, "I agree. I have a six-four Black male, and, yes, [he] has been stopped going to and from school." The prosecutor asked if this was her son. She responded, "Yes. And I tell him, 'If you're not guilty, sit on the curb. If they stop you, be truthful.' So far, they just stopped him because they said somebody was down the street robbing the car. Found out it wasn't him on the way home. That happens. That's life." Other African-American jurors responded.

The prosecutor then stated, "Okay. Now, you know, before I started this, I actually started to ask the question in a very general sense whether or not anybody has ever felt that a friend or relative or somebody like that has been unfairly targeted, and no one raised their hand. But if I directly asked you now, all of you have told me that, and I've picked the Black people in this room. That's obvious." He asked the jurors why they held back. Several African-American jurors responded.

Prospective Juror Thompson stated that she did not think the prosecutor was Hispanic until he mentioned his father and further stated, "So naturally everybody is biased about something, and you have to look at a person as being human, first of all. Not race, just a human."

The prosecutor then asked, "Okay. Now I asked the rest. I think the air is quite clear enough now so I can ask the question generally. Is there anyone here that feels Black people are unfairly targeted and that might affect your ability to be fair in this trial?" Several jurors responded that they could be fair.

The prosecutor told the jurors a story about a case involving an African-American defendant and an African-American juror in a case where the defendant confessed. The African-American juror said in deliberations, "'You know what, I cannot vote guilty against a Black person.'" The prosecutor then told the jurors, "And that's why I question Black people specifically about that issue, because you have before you a Black defendant. Is there anybody here that has that feeling? And I recognize that if you really do think that way, you may not tell me, but I'm asking for your honest opinion. [¶] Is there anybody that feels Black people are so unfairly targeted that they just can't -- they don't feel right? Because what's happening is it's almost a family situation. And I don't think it's wrong to feel that way. It would be wrong for someone to ask me to vote guilty against my mother, against my father, against my cousin. You know, you may have that feeling internally that says, 'You know what, I can't do it. I think we've been so badly treated historically that I just can't do it.'"

The prosecutor then directly asked two other African-American jurors and Prospective Juror Thompson, who responded they could do it. One other juror responded she could not convict an African-American person.

A sidebar conference was called. Defense counsel asked for a mistrial, arguing it was one of the most "absurd voir dire processes in the 33 years I've been practicing I've ever witnessed. He focused on five or six Black people exclusively. He browbeat [a juror] into saying she couldn't be fair." Defense counsel complained that the prosecutor focused on just the African-American jurors. He argued the prosecutor poisoned the entire jury panel, focused on the African-American jurors, and put them on the spot by saying they were all part of the same family and that to find not guilty would be doing that because they were African-American. He asked for a new panel, stating that although the prosecutor could inquire of the new panel about bias and prejudice, he could not focus on African-American jurors.

The prosecutor stated, "This is not racism. This is simply trying to get at the heart. And I also have to say, I'd like this to be on the record, I have spoken to several defense attorneys in this county and they have told me they have received -- one told me as much as 13 mistrials in Riverside County, and their whole intention is to have one Black juror . . . ." Defense counsel again interrupted and said this was racist. The prosecutor reiterated that is was well known that defense counsel in the county were seeking mistrials by keeping African-American jurors on the panel. The prosecutor argued it was fair to ferret out the issue and determine if the African-American jurors could be fair.

15

The trial court expressed concern that the prosecutor had only questioned the African-American jurors and never expanded the concern to the entire panel.  The trial court was concerned that, "by focusing almost exclusively on African-American members of the panel . . . you have tended to cause them to them to go somewhat the other way by assuring you that they will be able to vote guilty."  Defense counsel argued that, "These African-Americans, if they remain on the panel, have pledged to him they're going to be fair because they're Black.  That's ridiculous."

The prosecutor concluded, " . . . I'm not going to peremptorily challenge them.  I don't think I have grounds.  And if I got rid of all of these, it would be an easy case for *Wheeler*, but that's just not here."

The trial court stated,  "My feeling tends to be that counsel should be afforded a fairly wide latitude in pursuing a line of questioning that appears to possibly bear fruit with respect to discovery of a challenge for cause, even though it may be -- I don't want to use the word inflammatory -- may be something that is of great controversy or engender strong feelings, so long as it does not tend to cause other jurors, sitting jurors, to prejudge or commit themselves to a certain position."  Defense counsel continued to argue that the prosecutor had crossed the line by only interrogating African-American jurors.

The trial court ruled, "My preference would have been for the questions to have been directed more generally to the entire panel or to other persons who might harbor similar feelings, even though they may not be members of the African-American race.

16

However, I don't believe that [the prosecutor]'s questioning was intended to taint either the panel or the African-American members of the prospective panel to vote in a particular way. I tend to agree with [defense counsel] that the questioning was about as penetrating as I've ever heard, but I don't think it crossed the line." The motion for mistrial was denied.

The prosecutor peremptorily challenged three jurors, and defense counsel removed three jurors. The prosecutor accepted the panel as it was constituted, which included Prospective Juror Thompson. Five more jurors were excused, one by the prosecutor and four by the defense. The People accepted the panel after each excusal by the defense. Twelve more jurors were called who had been in the audience and had heard the prior voir dire.

Defense counsel was asking general questions about jurors being fair and agreeing with the criminal justice system. Juror Hernandez proffered, " . . . I have tell you that I went to a seminar on paralegal training at UC Irvine to decide whether I wanted to go further with it, and after I heard the attorneys talk, I realized I couldn't work for the defense . . . a defense lawyer. I could work for the prosecutor." Defense counsel asked her why. She responded, "A strong sense of right and wrong. I don't know how else to describe it. Just a clear black and white sense of right and wrong when it comes to the law." She also stated, "[T]he idea of defending people who are guilty, in my conscience, I could not do it." She denied she had prejudged the case but was stating her "inner conscience . . . ."

17

Five of the new jurors were excused for cause or due to hardship. At this point, the first peremptory challenge by the prosecutor was to Prospective Juror Thompson.

Defense counsel immediately made a *Wheeler* motion. Defense counsel argued that in the morning session that the prosecutor admitted that if he removed any of the 12 jurors in the box, which included Prospective Juror Thompson, it would be a *Wheeler* violation. Defense counsel stated, "So I'm not quite certain what my remedy is other than raising again the motion for mistrial, which I'll do, because now he has effectively gotten away with tainting the panel and then exercised a peremptory after conceding to so with [*sic*] a *Wheeler* violation. That's just absurd." The trial court found a prima facie case had been shown and said to the prosecutor, "Go ahead."

The prosecutor responded, "All right. The reason . . . and I agree, I did say . . . I do not agree, I should say, with defense counsel again that I have infected the jury. I think what I did was absolutely appropriate, which is to try and ferret out any type of bias. [¶] Now, I said before the lunch hour, I don't have a problem with the ones that are there, and [Thompson] was included, I had no intention of peremptorily challenging her. After the lunch hour, when I came back, during the breaks and throughout the proceedings, she was refusing to look at me at all. [¶] When [Hernandez] made the statement that she doesn't like defense counsel, she looked away in disdain. She put her head down and looked right away. And I was right there next to her, and that's what I saw. And we're not given a lot of information. We have to believe what they say, but you have to take those kind of cues. So that's the reason that I did it."

18

The trial court understood the position of the prosecutor to be that as of the morning session, he was satisfied with Prospective Juror Thompson. The trial court then stated, "You have since, based upon observations, discerned that she appears to be demonstrating an aversion to the prosecution or towards the process? I'm not quite sure." The prosecutor explained that Hernandez showed disdain for the defense, and Thompson looked away in "disdain."

Defense counsel did not see any disdain by Thompson. Defense counsel argued that if she did look away in disdain, it was because of the way the prosecutor had conducted voir dire during the morning session. He argued, "He has made this whole think toxic by the way he confronted those African-Americans and put them on the spot to make them feel as if they wouldn't be fair simply because of their race or color, and that's exactly what -- if she did have disdain, I didn't see it. And if she did, I can see why it was there."

The trial court ruled, "All right. I'll deny the *Wheeler/Batson* motion at this time. I'll find that [the prosecutor]'s statements, although I did not observe that myself, are credible and that the prosecutor may rely upon his observation of body language and demonstrated antipathy, If you interpret it as such, towards other jurors or their attitudes as a ground for exercise of a peremptory challenge. [¶] I don't believe that I'm going to be required to engage in a comparative analysis at this time, but if the motion is renewed at any point, I probably will have to."

19

The following day, the prosecutor stated to the trial court, "Based on the charges of racism yesterday, I really think it's important that it be on the record that there, first of all, w[ere] six black jurors, I believe, that were left on the panel and one black alternate." The trial court confirmed that there were at least five or six African-Americans on the panel, and one alternate.

We find the trial court could find the reasons given by the prosecutor were credible and race neutral. "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix, supra,* 44 Cal.4th at p. 613, fn. omitted.)

Here, the record establishes that something had changed with Prospective Juror Thompson. It is clear from the record that Prospective Juror Thompson was initially actively engaged in the voir dire process. The prosecutor had accepted the panel as constituted, which included Prospective Juror Thompson. However, after voir dire of new members, the prosecutor peremptorily challenged Prospective Juror Thompson. The prosecutor explained that Prospective Juror Thompson's demeanor had changed. She

20

would not longer look at him and also looked away in disdain. These were proper reasons that the trial court could rely upon to support the removal. Such explanations were credible given that the prosecutor had initially accepted the panel that included Prospective Juror Thompson.

Despite the fact that defense claimed not to see the change in her demeanor, the trial court could reasonably rely on the prosecutor's own observations. The trial court's finding that the prosecutor's stated reasons were sincere and genuine "is entitled to great deference where, as here, the reasons are based on the prospective juror's appearance and demeanor. [Citation.]" (*People v. Ward* (2005) 36 Cal.4th 186, 202.)

Moreover, "[a]lthough circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case, including this one, to make a prima facie case after the excusal of only one or two members of a group is very difficult. [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 3.) Although the trial court found a prima facie case, since only one African-American juror was peremptorily challenged by the prosecutor, defendant's claim that the prosecutor was motivated by race to excuse Prospective Juror Thompson is untenable.

Additionally, at the time that the prosecutor exercised this single peremptory challenge against Prospective Juror Thompson, at least six African-American jurors remained on the panel. "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling

21

on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168, abrogated on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)  Although this is not conclusive, it is an indication that the prosecutor acted in good faith.

Finally, we see nothing from the record that supports that Prospective Juror Thompson was influenced by the prosecutor's voir dire questions.  During questioning, Prospective Juror Thompson was actively engaged.  Only after a break and the comments by another juror did she shun the prosecutor.

We note that defendant has not asked this court, and he did not ask the trial court, to engage in comparative juror analysis.  "Despite problems inherent in conducting comparative juror analysis for the first time on appeal — including the difficulties of comparing what might be superficial similarities among prospective jurors and trying to determine why the prosecutor challenged one prospective juror and not another when no explanation was asked for or provided at trial — both the high court and this court have done so on request.  [Citations.]" (*People v. Jones* (2011) 51 Cal.4th 346, 364.)  Moreover, "'evidence of comparative analysis must be considered in the trial court and even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons." (*Lenix, supra,* 44 Cal.4th at p. 622.)  Since defendant has not made such a request, and did not adequately develop the record below, we decline to engage in such analysis on the cold appellate record.

After the briefing was complete in this case, the California Supreme Court issued several opinions addressing *Batson/Wheeler* claims. (*People v. Harris* (Aug. 26, 2013, No. S081700) ____Cal.4th _____ [2013 D.A.R 11317]; *People v. Jones* (Aug. 26, 2013, No. S042346) ____Cal.4th _____ [2013 D.A.R. 11413]; *People v. Mai* (Aug. 26, 2013, No. S089478) ____ Cal.4th _____ [2013 D.A.R. 11356].)  In the concurring opinion in *Harris*, Justice Liu expressed his concern that the court (in the majority opinion in *Harris* and in prior cases) was elevating the standard for establishing a prima facie case of discrimination beyond that required by the United States Supreme Court, that the court had found discrimination in only one of the more than 100 cases that had adjudicated *Batson* claims over the prior two decades, and encouraged comparative juror analysis be conducted in all cases.  (*People v. Harris, supra*, _____ Cal.4th _____ [2013 D.A.R. 11317, 11340, 11345, 11352] (conc. opn. of Liu, J.).)  Justice Liu again expressed his concern in concurring opinions in both *Mai* and *Jones.*  (*People v. Mai, supra,* ____ Cal.4th _____ [2013 D.A.R. 11356, 11383, 11388] (conc. opn. of Liu, J.)); *People v. Jones, supra,* ____ Cal.4th _____ [2013 D.A.R. 11413, 11444-11446] (conc. opn. of Liu, J.).)  However, the majority opinions in these cases continued to employ the standard for evaluating *Batson/Wheeler* claims as set forth in this opinion, *ante*.  (*See People v. Mai, supra,* _____ Cal.4th _____ [2013 D.A.R. 11356, 11379].)  These recent opinions have no impact on the result here.  We conclude that the trial court did not error by finding that the race-neutral reasons given by the prosecutor were adequate and find no *Wheeler/Batson* had occurred.

## III

## SECTION 654 AND MONEY LAUNDERING

Defendant contends that her convictions for money laundering in counts 5 (Salazar), 10 (Crockett), 16 (Grizzell), and 23 and 27 (Vargas) should have been stayed pursuant to section 654. She argues that she had a single objective of stealing the victims' money. The money laundering occurred simultaneous with the unlawful receipt of money. These convictions, as outlined, *ante*, were based on the wire transfers out of escrow to DRE. As such, when the deeds of trust were filed, the money was transferred to DRE.

At sentencing, the People argued that the money laundering convictions should run consecutively, as they were "separate and apart" from the other parts of defendant's scheme. Defendant's counsel argued that the money laundering was all part of one transaction to obtain fraudulent loans and have the money wired to defendant. The People then argued that section 186.10 expressly stated that section 654 should not apply. The prosecutor referred to the fact that section 115 contained language that it was not subject to the bar in section 654, and section 186.10, subdivision (b) contained the same language. The trial court ruled, "Subdivision (b) sets forth the penalty in language that is similar to that in 115. I'll find that money laundering in violation of Penal Code section 186.10, specifically subdivision (b), is not subject to the provisions of Penal Code section 654." Inexplicably, on appeal, neither party discusses subdivision (b) of section 186.10.

We conclude the trial court properly determined that the plain language of section 186.10, subdivision (b) excludes its provisions from being subject to section 654.

Section 654, subdivision (a), enacted in 1872, "bars multiple punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective." (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) " . . . 'If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Conners* (2008) 168 Cal.App.4th 443, 458.)

Section 186.10, subdivision (a) provides in pertinent part as follows: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000) . . . through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering." A transaction includes a deposit into or withdrawal from a financial institution. (§ 186.9, subd. (c).)

25

"[A] Penal Code section 186.10, subdivision (a) prosecution based on a defendant's conducting a transaction through a financial institution with a monetary instrument of $5,000 or more based on the knowledge of criminal proceeds theory, requires proof that (1) the defendant's entire business was illegal, (2) there were deposits of $5,000 or more in criminally derived funds, or (3) there was a transfer of all funds out of the account." (*People v. Mays* (2007) 148 Cal.App.4th 13, 32.)

Section 186.10, subdivision (b) provides, "*Notwithstanding any other law*, for purposes of this section, each individual transaction conducted in excess of five thousand dollars ($5,000), each series of transactions conducted within a seven-day period that total in excess of five thousand dollars ($5,000), or each series of transactions conducted within a 30-day period that total in excess of twenty-five thousand dollars ($25,000), *shall constitute a separate, punishable offense*." (Italics added.)

In *People v. Gangemi* (1993) 13 Cal.App.4th 1790, the court, in addressing the application of section 654 to violations of section 115, noted that a different rule applies to offering false instruments for filing or recording. (*Gangemi*, at p. 1800.) It recognized that the language of section 115, subdivision (d) provides that "'[f]or purposes of prosecution under this section, each act of procurement or of offering a false or forged instrument to be filed, registered, or recorded shall be considered a separately punishable offense.'" (*Gangemi*, at p. 1800.) It noted, "This language demonstrates an express legislative intent to exclude section 115 from the penalty limitations of section 654. Thus, the Legislature has unmistakably authorized the imposition of separate penalties for

each prohibited act even though they may be part of a continuous course of conduct and have the same objective. [Citation.] . . . [E]ach false filing is separately punishable." (*Ibid.*)

Section 186.10, subdivision (b) contains even stronger language that it is not subject to section 654. "It is assumed that the Legislature has in mind existing laws when it passes a statute. [Citations.]" (*Estate of McDill* (1975) 14 Cal.3d 831, 837.) Here, in enacting section 186.10, it is presumed that the Legislature was familiar with section 654. The California Supreme Court has recognized that the Legislature has the power to override section 654 in specific circumstances and that it need not necessarily cite section 654 specifically. (See *People v. Benson* (1998) 18 Cal.4th 24, 32-33.) Based on the plain language of section 186.10, subdivision (b), defendant's convictions pursuant to section 186.10, subdivision (a) were not subject to the prohibition of multiple punishment under section 654.

Defendant relies exclusively on the holding of *Conners* as support for her position that all of the money laundering convictions should have been stayed. In *Conners*, the defendant was charged with money laundering and receiving stolen property for cashing five checks that were written to him from a fund that was illegally obtained through a fraudulent sale of property. (*People v. Conners*, *supra*, 168 Cal.App.4th at p. 450.) The issue in that case was whether the defendant could be separately punished for receiving stolen property based on the same act that was the subject of the money laundering. The appellate court concluded there was clearly a single, indivisible course of conduct since

27

the receipt of the stolen money and the cashing of the five checks were part of the same transaction. It noted that any sentence at his resentencing must reflect a stay of the sentence for receiving stolen property. (*Id*. p. 458.)

We note that the *Conners* did not discuss the language in section 186.10, subdivision (b). However, it noted that the receiving stolen property convictions must be stayed, not the money laundering convictions. As such, it is not in conflict with our decision here.

Even if we were to conclude that defendant's convictions for violating section 186.10, subdivision (a) were subject to section 654, its provisions were not violated. Defendant obtained the fraudulent loans and properties in the names of Salazar, Crockett, Grizzell, and Vargas all on separate occasions. Moreover, defendant first obtained the deeds of trust for these properties. In addition to obtaining the deeds of trust, she siphoned off money to DRE from the loans for her personal use. It remained to be seen what she was planning to do with the deeds of trust and the properties that she had fraudulently obtained. She clearly had a separate objective in taking money from the loans initially and could be separately punished.

Based on the foregoing, defendant was properly sentenced consecutively for her convictions pursuant to section 186.10, subdivision (a).

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS.

RICHLI _____

J.

We concur:

McKINSTER _____

Acting P. J.

KING _____

J.