Filed 6/30/14  P. v. Aparicio CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049820 |
| v. | (Super. Ct. No. INF057321) |
| FRANCISCO FLORES APARICIO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, David B. Downing, Judge.  Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury found defendant Francisco Flores Aparicio not guilty of first degree murder, but convicted him of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.)[1] The jury found true allegations that defendant (1) personally and intentionally discharged a firearm, proximately causing great bodily injury or death to another person (§ 12022.53, subd. (d)), and (2) personally and intentionally used a firearm in the commission of his offense (§ 12022.5, subd. (a)). The court sentenced defendant to 40 years to life in state prison, consisting of 15 years to life for second degree murder and a consecutive 25 years to life for the section 12022.53, subdivision (d), firearm enhancement.

Defendant raises two appellate contentions. First, he claims the court erred in denying his *Batson*/*Wheeler* motion,[2] which was based on the prosecutor's use of peremptory challenges on three potential jurors with Hispanic surnames. Second, defendant asserts the court erred in excluding evidence establishing his victim was associated with a criminal street gang. We affirm.

FACTS

It was uncontested at trial that defendant shot and killed another man with a shotgun. Indeed, defendant testified that he "lifted the weapon and . . . made the shot," hitting the intended party "[i]n the chest" with the first shot, then fired a second shot that (according to other evidence) hit the victim in the head, instantly killing him. The issue for the jury was what criminal culpability, if any, defendant bore for his actions, which

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), disapproved on a ground not material to this appeal in *Johnson v. California* (2005) 545 U.S. 162, 168, 173.

occurred during a confrontation between defendant and his girlfriend's husband, from whom she had separated several months earlier.

*Evidence at Trial*

Joanna Morales (whose testimony provided the basis for much of this recitation of facts) separated from her husband Israel Morales in September 2006 because he physically attacked and threatened her. Joanna told police in September 2006 that Israel tried to kill her. Israel, a trained boxer, hit Joanna with both hands, grabbed her by the neck, pushed her, and kicked her several times.

Defendant rented a room in an apartment in Indio, California, which was owned by Joanna's parents. After separating from Israel, Joanna moved into the same apartment with her five children. From the beginning, Israel exhibited jealousy as a result of these living arrangements. In approximately January 2007, defendant began a romantic relationship with Joanna. When Israel learned defendant and Joanna were dating, Israel threatened and insulted Joanna, adding that both Joanna and defendant should watch their respective backs.

On February 11, 2007, a series of events culminated in Israel's death. In the morning, Israel and Joanna argued on the phone and later in person about the care of their children and their respective romantic lives. While outside the apartment where Joanna and defendant lived, Israel pulled out a knife and told Joanna he would kill her. Joanna ran inside, locked the door, and continued to argue with Israel from her window. Before leaving, Israel kicked defendant's truck, causing a visible dent. Defendant was not at home at this time. Joanna's brother told a police officer immediately after the shooting that, on the morning of February 11, 2007, he saw Israel point a knife at Joanna and threaten to kill Joanna and defendant. Joanna's brother also told the officer that Israel was jealous and wanted to kill defendant, but defendant did not have any problem with Israel prior to the shooting.

Defendant returned home sometime in the afternoon. Defendant invited Joanna to run some errands with him. Defendant noticed the dent on his truck and inspected it; Joanna initially denied knowing what had happened. Joanna subsequently informed defendant of Israel's conduct while the couple drove around. Defendant appeared to be upset by the revelations; he was silent and refused to hold hands with Joanna. Nevertheless, defendant continued with his errands, which concluded with a trip to a restaurant to buy refreshments.

After returning home, on defendant's insistence, Joanna called Israel on her cell phone and handed the phone to defendant. Joanna then stepped out of the truck while defendant talked to Israel. Five minutes later, defendant (22 years old at the time) entered his bedroom and changed into the clothes he typically wore (loose sweaters, loose pants, and black gloves) before going back outside. Joanna called Israel and told him not to come over; Israel informed Joanna he was coming over to "kick [defendant's] ass." Israel then seemingly relented and told Joanna he would not come over.

Meanwhile, defendant was sitting in his truck with a shotgun by his legs. Despite the presence of the gun, defendant told Joanna (who sat in the truck in the passenger seat with her one-year-old daughter) that he and Israel were "just going to talk." Israel arrived in his car. Defendant remained seated in his truck. A shirtless Israel got out of his car and stood on top of a short cinder block wall. Defendant stepped out of his truck. Joanna got out too and approached defendant by the driver's side of the truck, "begging him not to do anything stupid." As she did so, Joanna heard Israel shouting expletives at defendant. Defendant ignored Joanna and pushed her hand away. Joanna then approached Israel, still with her daughter in her hands. She was asking both men to calm down. Joanna turned her back to Israel and faced defendant.

Israel shouted at defendant "to put down the gun and fight like a man," adding other insults. Israel said, "What, fool. Put the gun down. Don't you have any balls?" Defendant pointed the shotgun in the direction of Israel and Joanna. Joanna

4

continued to ask the men to calm down.  Israel pushed Joanna, causing her to fall to the ground.  Defendant then fired the shotgun at Israel.  Israel fell to the ground.  By his own admission, defendant pumped the shotgun to load another round into the firing chamber; the shotgun could not reload automatically.  Stepping toward Israel, defendant shot again within seconds.  Defendant entered his truck and drove away.  Police apprehended defendant in Salinas, California on March 1, 2007.

A forensic pathologist testified that Israel suffered two major shotgun wounds, one to the right side of his chest and one to the head.  The shot to the chest occurred from four to five feet away and would have caused death in two to three minutes.  The shot to the head was from less than two feet away, and was instantaneously fatal.

The only weapon found by police on Israel's body was a folded pocket knife with a four-inch blade, which was inside Israel's pocket.  Israel always carried this or a similar knife.  No firearms or other weapons were found in Israel's car by police.

Israel had a blood-alcohol content of .12 percent, as well as methamphetamine and amphetamine in his system, when he was killed.  A toxicologist testified that Israel was under the influence of alcohol and methamphetamine at the time of the shooting, which combination would have made Israel more aggressive and less inhibited.

*Defendant's Testimony*

The first time defendant met Joanna was in 2005, when she was crying, at her mother's house after Israel had hit her.  Defendant noticed in early 2007 that Israel would either ignore him or stare at him on the occasions they were near each other.

In addition to telling defendant about the events of the morning of February 11, 2007 (including the fact that Israel had poked her with a knife and threatened to kill both of them with a gun), Joanna had told defendant the following about Israel at various

5

times before the deadly confrontation occurred: (1) Joanna had separated from Israel because he beat her ("he hit her a lot"); (2) Israel was upset about the romantic relationship between defendant and Joanna; (3) Israel had threatened to kill defendant; (4) Israel had stabbed two people in the past; (5) Israel had been in "a fight with some guys, and that she had heard shots"; and (6) Israel drank excessively and used methamphetamine.

Defendant was scared by the situation and took the threats seriously. Defendant instructed Joanna to call Israel with the intention of calming things down. Defendant overheard Israel say to Joanna that defendant was a "fucking sissy" and that Israel was coming over to kill both Joanna and defendant. Defendant talked to Israel on the phone and tried to calm him down; Israel reacted with more threats and insults. Defendant responded that he would be waiting for Israel so they could talk things out. Defendant repeatedly told Joanna to call the police.[3] Defendant waited outside because Israel said he would shoot inside the house if defendant was not outside. Defendant had Joanna retrieve his shotgun because Joanna told him Israel would have a gun.[4] Defendant loaded the shotgun with two rounds.

When Israel arrived, he skidded on the gravel in a cloud of dust, then took his shirt off as he stepped outside the car. Defendant thought he saw Israel grab something from his car and place it behind his back. Joanna approached Israel and defendant saw Israel push her away; when Joanna screamed, defendant thought she had been stabbed or shot. At that point, defendant was still sitting inside his truck.

---

[3] Joanna testified she did not remember if defendant told her to call the police.

[4] Joanna testified she had never seen the shotgun before. Joanna also denied ever telling defendant that Israel carried a gun. Joanna's brother testified that defendant used to carry a gun with him in his car.

Defendant then got out of the truck with his shotgun. Defendant tried to calm Israel down and asked him to leave. Israel approached defendant and told him, "It's over for you, you dog" while he reached behind his back. Defendant was afraid of being shot; he lifted his gun and shot Israel in the chest. Israel said from the ground, "I'm going to kill you" and placed his hand behind his back. Defendant fired again, but did not know exactly where he was pointing.[5] Defendant drove away in fear; he did not know Israel was dead until his apprehension.

On cross-examination, defendant admitted he had told an investigating officer that he would not have shot Israel had he not been angry.

DISCUSSION

*Prosecutor's Use of Peremptory Challenges*

Defendant first contends the court erred by denying his *Batson*/*Wheeler* motion. Defendant asserts the prosecutor improperly utilized his peremptory challenges to remove prospective Hispanic jurors. "The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.) "Group bias is a presumption that jurors are

_____

[5] Defendant testified, "Well, he said, I'm going kill you, and he put his hand behind his back. I felt shivers. I felt cold, and I felt that as if he had already shot me all over. And when he put his hand behind his back saying, I'm going to kill you, I just — I just saw that his hand was in the back. And I just heard the shot." "It was ugly. I felt something horrible. I felt like he had fired at me." "Before the shot rang out. I felt this cold, I felt like needles were hitting me in my back. And I just heard the shot." He was not aiming at Israel's head. "I didn't see where the weapon was. With the fear that I felt, I didn't see where the weapon was."

7

biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds." (*People v. Fuentes* (1991) 54 Cal.3d 707, 713 (*Fuentes*).)

A jury pool of 89 prospective jurors presented themselves for service on August 17, 2011. A large number of those jurors, including more than 20 with Hispanic surnames, had been dismissed for cause or based on a financial/educational/medical hardship (most of these by stipulation of the parties) by the time defendant challenged the prosecutor's use of peremptory challenges on August 18. Defendant moved under *Batson/Wheeler* after the prosecutor's fourth peremptory challenge, based on three of the four challenged jurors possessing Hispanic surnames. The prosecutor's first selection was named Baum (an individual who appeared to be of Caucasian extraction) but the subsequent three selections were named Cervantes, Nunez, and Ochoa. The ethnic composition of the jury as ultimately empanelled cannot be divined from the record, as the names of the jurors have been redacted. Of course, it was unclear at the time of the motion what the actual composition of the jury would be, and defendant did not (at the time of the motion or thereafter) make a record of the jurors' ethnic identities or otherwise base his motion on this factor.

Once a *Batson*/*Wheeler* motion is made, trial courts follow a three-step procedure: (1) the moving party must make a prima facie showing of improper use of peremptory challenges; (2) the burden shifts to the opposing party to provide a bias-free explanation for the use of peremptory challenges; and (3) the trial court assesses the credibility of the bias-free explanation and determines whether there was wrongful discrimination. (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*); see also *Fuentes*, *supra*, 54 Cal.3d at p. 714.) The defendant's ultimate burden is to demonstrate "it was more likely than not that the challenge was improperly motivated." (*Johnson v. California*, *supra*, 545 U.S. at p. 170.)

The court found a prima facie case had been shown because three of the four peremptory challenges were used on individuals with Hispanic surnames. It is uncontested on appeal that defendant made a prima facie showing jurors were being removed on the basis of group bias. (See *People v. Trevino* (1985) 39 Cal.3d 667, 684-686 [Hispanics are cognizable group subject to *Batson/Wheeler* motion], disapproved on other grounds in *People v. Johnson* (1989) 47 Cal.3d 1194, 1221.)

The prosecutor responded to the challenge by addressing each of the three selections. "I first start with Mr. Ochoa. Mr. Ochoa was dismissed at the People's request because of his age group, which is not a cognizable protected class. He's young. He is — lack of life experience. He, although he does have a child at a rather young age, single, age was a — the People's primary concern with Mr. Ochoa. And I would ask that — that the court state for the record that Mr. Ochoa appeared to be rather young, I believe. Only thing he mentioned, recently obtained his US citizenship, but he appeared to be somewhere between 18 to 22, not much older than that." The court interjected that Ochoa had graduated from college the previous December and he appeared to be approximately 21 or 22 years old.

Also with regard to Ochoa, the prosecutor did not like his reaction to questioning pertaining to direct and circumstantial evidence. Ochoa "was getting a little smart the way he was kind of smiling about it, but I went through one of my hypotheticals from yesterday and he started adding all kinds of facts to it and saying, you know, I don't want to jump to make a judgment. Those types of things. I . . . had to follow up by making a very simple hypothetical . . . and I think I went to another juror to try to explain that because again he was going somewhere else with it. And that rather basic concept seemed to cause him some concern and [he] became distracted . . . ."

As to Nunez, the prosecutor expressed similar concerns regarding the question of circumstantial evidence. The prosecutor had earlier moved to dismiss Nunez (who the court described as "one of the smartest jurors you got on the whole panel") for

9

cause, stating she "was ranting about passing judgment on people and following the court's instructions, direct and circumstantial evidence. She went on about seeing people at the store and not passing judgment on them because they're wearing baggy pants." She was "completely offtrack" on the question of following "the court's instructions on direct and circumstantial evidence." The court denied the earlier motion to dismiss Nunez for cause; the prosecutor noted at the time that he would "just use a peremptory."

At the *Batson/Wheeler* hearing, the prosecutor expounded upon his concerns with regard to Nunez. "When I started questioning her, she went on basically a rant when I did the direct versus circumstantial evidence and started talking about how she did not make judgments about people at the stores, how they were dressed, she . . . made several cryptic comments about that it's difficult to be on the jury because you're given instructions and you may have beliefs about . . . whether one is innocent or guilty but you have to follow instructions, and that that made it difficult because she didn't really like that. They were cryptic comments. I didn't really understand where she was going with that but [it] caused me to be uncomfortable with her. And because of that and her more hostile response to me regarding the direct and circumstantial evidence hypotheticals, I used a peremptory on Mrs. Nunez."

With regard to Cervantes, "when the court did its voir dire and [defense counsel did his], [Cervantes] didn't cause me much concern. What my observation was of him . . . , he appeared to be a little slower than some of the other jurors in going through the questions. He just seems slower. Like it was, I don't know, he needed more time to process the material[.] [A]t one point, in the record will reflect this, when the court called on Mr. Cervantes, he didn't respond. He — I don't know if he was sleeping or if he was just kind of zoning out, but because of that I . . . didn't feel comfortable with his level of attentiveness in the courtroom." The court agreed that "Cervantes appeared to take a . . . long time reading the questionnaire. What that means, I don't know." The

10

prosecutor concluded, "I was borderline on Mr. Cervantes, but because it's a short trial I needed him . . . to be here 100 percent during the course of that."

The court then offered defense counsel the opportunity to rebut the prosecutor's stated reasons. Addressing only Ochoa, defense counsel claimed an individual who ultimately served as a member of the jury was also young ("probably 24, 26 years old"). The court noted this individual was also a registered nurse in a cardiac care unit whereas Ochoa was a tutor who had just graduated from college. Defense counsel argued Ochoa's youth "would have been a plus more than a detriment" based on the difference of his life experiences as compared to the older members of the jury. With regard to circumstantial evidence, defense counsel claimed Ochoa was merely explaining he would "be analytical" about its use, not that he would reject it. The court suggested it is a truism among prosecutors to prefer (in general) older rather than younger jury members based on the perception that individuals grow more conservative as they age with regard to criminal law issues.

Thus, the prosecutor offered facially race-neutral explanations for using peremptory challenges to remove the prospective jurors at issue. But defendant claims these reasons were pretextual and the prosecutor actually rejected the three jurors at issue because of bias, an accusation rejected by the court based on its examination of the "totality of the circumstances."

Our review of the record indicates "[t]he trial court denied the motions only after observing the relevant voir dire and listening to the prosecutor's reasons supporting each strike and to any defense argument supporting the motions. Nothing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the prosecutor's reasons or that it failed to fulfill that duty." (*People v. Lewis* (2008) 43 Cal.4th 415, 471, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Thus, the only question on appeal is whether substantial evidence supports the court's ruling that the prosecutor's use of peremptory challenges was not based on group

11

bias. (*Lewis*, at p. 471; *Lenix*, *supra*, 44 Cal.4th at p. 613; see also *People v. Williams* (1997) 16 Cal.4th 635, 666 ["We accord great deference to a trial court's determination of the sufficiency of a prosecutor's explanations for exercising peremptory challenges"].)

The prosecutor's "'[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.) "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." (*Snyder v. Louisiana* (2008) 552 U.S. 472, 477.) One way to weigh the sincerity of proffered reasons for excusing prospective jurors is to compare the empanelled jurors to excluded jurors. (*Lenix*, *supra*, 44 Cal.4th at pp. 621-624; *id*. at p. 622 [noting the "inherent limitations" of "comparative juror analysis on a cold appellate record"].)

The prosecutor's stated reasons certainly have a basis in the record. Ochoa recently graduated from college and there is no argument from defense counsel that Ochoa was older than 22 years old. Ochoa's youthful lack of gravitas was also supported by his late arrival to court on the morning of his voir dire. Both Ochoa[6] and Nunez[7] were

---

[6] When asked whether he could use circumstantial evidence to determine someone's state of mind (in the context of a hypothetical burglar entering a business to steal an item on the shelf), Ochoa stated: "Kind of tricky, but I would probably think no. Because I could have an intention to do something, but if I don't do it, then . . . that means that my intentions were, you know, lost during the process of . . . me going there. I could have an intention to go home right now, but then I get hungry and deviate and go to the casino and buy a burger and then start gambling." "If I walk in that store with a razor blade and my intentions at the beginning were to rob a CD, or whatever you said it

12

argumentative and opinionated on the subject of the use of circumstantial evidence and other facets of jury service. It appears Cervantes was not listening to the voir dire when the court announced it was his turn to respond to the questionnaire. It is less apparent from the record that Cervantes took a long time to review the questionnaire, but defense counsel did not contest this fact in responding to the prosecutor's explanation of his reasons for striking Cervantes.

Similar justifications to those offered by the prosecutor have been credited as valid and reasonable in other cases. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106-1107 [reluctance to rely on circumstantial evidence], overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Ward* (2005) 36 Cal.4th 186, 202 [perceived hostility to prosecutor]; *People v. Reynoso* (2003) 31 Cal.4th 903, 924 [lack of educational experience]; *People v. Jenkins* (2000) 22 Cal.4th 900, 994-995 [lack of attentiveness to jury service based on loyalty to job];

---

was, and then . . . I met . . . a nice, young, little girl and we start a conversation and walk out . . . , and my intention might never have been to meet that girl, but they changed. I mean, intentions can change due to . . . time, you know."

[7]     Similar to Ochoa, Nunez stated with regard to the use of circumstantial evidence: "No. Because, you know, sometimes, you know, you can't have judgment. I walk in a store with a big purse because sometimes the fashion is, you know, people have big purses, and I — . . . people following me around thinking that I'm going to steal something, and I don't like that. That's passing judgment just because you walk in a store. Or the person is dressed a certain way or the person carries something, you automatically assume that that person is going to steal something from the store. So I . . . think that's wrong." As for her "cryptic" comments, Nunez denied she was "spacing out" when asked a question, then stated, "I was thinking of other things about the last trial that [she] was on. . . . [T]here's a lot of guidelines you have to follow, kind of hard to — even if you think the person or — is innocent or — or there's a lot of guidelines that you have to follow and on evidence. So it's kind of hard. It's a little frustrating because there's, you know, you know, there's a lot of evidence that shows that the person may be guilty but basing, you know, based on guidelines you have to follow, you can't, you know, come up with that kind of a — a judgment, you know. So it's kind of frustrating but just got to follow the rules, like I said."

13

*People v. McGhee* (1987) 193 Cal.App.3d 1333, 1351-1352 [youth is not cognizable class].)

Defendant's perfunctory attempt at comparative analysis with regard to Ochoa is unavailing.[8] Like at trial, defendant points out that one juror was also relatively young. For the first time in his appellate briefs, defendant compares two other jurors' jobs (marketing for a gold resort and customer service) with that held by Ochoa (tutor). Defendant does not identify any jurors who were as young or younger than Ochoa, with a similarly limited breadth of life experience. Nor does defendant identify any jurors who expressed similar views on the topic of circumstantial evidence. Defendant did not establish a record with regard to the ethnicities of any of the empanelled jurors, including those he seeks to perform a comparative analysis upon. Our own review of the record and comparison of defendant with the jurors ultimately empanelled reveals no indication of bias on the part of the prosecutor.

In sum, there is substantial evidence for the court's conclusion that defendant did not prove racial discrimination by the prosecutor in his use of peremptory challenges.

*Admissibility of Evidence Concerning Victim's Involvement with Gang*

Before trial, the prosecution moved to exclude evidence that Israel (the victim) was a member of a criminal street gang. The prosecutor claimed this was not proper evidence of the violent character of the victim pursuant to Evidence Code section 1103, subdivision (a)(1). The prosecutor did not otherwise contest defendant's right to establish Israel's violent character or threats of violence known to defendant.

Defense counsel advocated for the admission of gang evidence. To wit, counsel wanted to elicit testimony about how Israel began to turn violent with Joanna

---

[8] Defendant does not attempt to compare Nunez or Cervantes with any of the empanelled jurors.

14

after he started hanging out with the "Oasis Crew," an alleged gang. Also, when defendant was talking to Israel on the phone immediately before the confrontation, Israel allegedly told defendant (as summarized by defense counsel), "look, I hang out with the crew of — with Oasis and you don't know who you're effing with." Defense counsel acknowledged there was no evidence Israel was an actual gang member, but represented there was evidence Israel "was affiliating himself with a gang or hanging out with a gang." Defense counsel explained Israel was trying to "bluff himself or to puff himself up and . . . make himself look like a tough guy member of the gang, . . . especially toward [defendant], and that is relevant to [defendant's] state of mind as to who he's confronting, who is going to come over and . . . kick his behind or shoot him or kill him, as the person threatened." Defense counsel offered to call a gang expert witness to explain that hanging out with a gang means one is "an affiliate or an associate with a gang." But defense counsel did not "even want to go that far. I just want the jury to see, to view [Israel] in the light he put himself in. He wanted to be seen as a gangster, hanging out with the gangs and threatening the wife and [defendant], that he was . . . a gang member and he was going to come over and kill [defendant]." In response to a direct question from the court about what Israel said to defendant, defense counsel offered, "You don't know who . . . you're fucking with . . . and that, I hang out — I'm . . . with the Oasis gang, and I'm going to come over and kill you. [A]nd that's when the . . . telephone conversation ended, and he came over and . . . the shooting happened."

The court, applying Evidence Code section 352, granted the prosecution's motion to exclude evidence of gang affiliation. First, there was no evidence Israel was a gang member. Second, the "alleged comments about a gang are perhaps arguably relevant to show" "the defendant is in fear of him. But under [Evidence Code section] 352, I'm not going to let gang stuff in because when a jury hears gang, it offends them. Most jurors are outraged, as is any normal human being, by the gang activity here and in other places, and the jurors think that, particularly since the last elected [district attorney]

15

made such a big deal about it and made comments in the press that Indio was gang-infested, or words to that effect, jurors think — they do think that there are gang members running everywhere. I mean, they do believe that. And when they hear the word gang, their minds are immediately switched. They put gang and guilty in the same sentence. If a jury hears 'gang,' they will convict anybody of any crime. I'm serious. They really, really are upset over the gang thing."

"[T]here are two problems: One, it's really prejudicial; and secondly, the victim wasn't a gang member. That's the big thing. He wasn't a gang member, apparently. So any comments he may have made on that subject, he was just puffing, so to speak, making himself look better, looking like he was a tough guy. I think it would be so prejudicial that it way outweighs any probative value at all."

After the court made its ruling, the prosecutor disclosed he had previously represented to defense counsel that pictures depicting defendant posing with other young males, "throwing hand signs" and displaying a shotgun (and "things of that nature") would not be used at trial. The prosecutor prefaced this explanation with a comment that "the issue of gangs, that would go both ways." Presumably, the prosecutor meant he would reverse course and seek to admit these photographs should the court have ruled differently regarding Israel's claims of gang affiliation. The prosecutor did not state there was any evidence establishing that Israel was aware of these photographs, or otherwise aware that defendant said or did anything to imply an association with a gang or gang members.[9]

The court agreed that "gang evidence is a two-way sword." The court once again reiterated its ruling: "I just don't see enough connection between gangs for it to be

---

[9] As explained below, defendant made statements to a police officer after his arrest suggesting his brother was a gang member and that he hung around with gang members in his hometown of Salinas. Based on admissibility concerns, the prosecutor did not seek to introduce any of defendant's statements to police in his case-in-chief.

16

admissible evidence . . . to try to paint the victim as a gang banger. It doesn't appear to me that he was at this point. He might have been other things. I've told you the wife beating comes in. The threats against her and [defendant] come in. But not his gang affiliation. So you got two out of three."

As made clear by the foregoing comments of the trial court and lawyers, there were two distinct possible uses of the gang evidence. One was to prove the victim's character. "[C]haracter evidence is generally inadmissible to prove a person acted in conformity with it on a given occasion." (*People v. Myers* (2007) 148 Cal.App.4th 546, 552 (*Myers*).) But Evidence Code section 1103, subdivision (a), authorizes the admission of evidence of a victim's character in appropriate cases; Evidence Code section 1103, subdivision (b), authorizes evidence of a defendant's character for violence if offered in response to evidence that the victim had a character for violence. (*Myers*, at pp. 552-553.)

As character evidence, we agree the court did not abuse its discretion by deeming the gang evidence inadmissible. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828 [abuse of discretion standard applies to evidentiary rulings regarding victim's character for violence].) As the court emphasized, there was no offer of proof that defendant really was in a gang. Moreover, although gang members collectively engage in violent activities, affiliation with a gang by one individual is not synonymous with acts of violence on the part of that individual. (See *Hodge v. State* (Miss. 2002) 823 So.2d 1162, 1165 [victim's tattoo of word "Gang$ta" was inadmissible as character trait in and of itself; no evidence of act of violence by victim].) The court rightly allowed evidence of specific instances of conduct to prove the victim's violent character. But defense counsel did not offer to prove the causal link between defendant's affiliation with the gang and these instances of violence (other than noting the temporal overlap between these issues in Israel's life). Any minimal value of the gang evidence for purposes of proving Israel's violent character was substantially outweighed by its

17

prejudice, in that the jury could be led to excuse a crime by defendant based solely on the victim's alleged gang status. This result is also buttressed by the possibility that a contrary ruling may have opened the door to evidence suggesting defendant himself affiliated with gang members, resulting in a major diversion from a case triggered by a love triangle rather than gang violence.

The other ground for admission of Israel's claims to gang affiliation was as evidence of defendant's state of mind. (Evid. Code, § 1101, subd. (b) [prohibition on character evidence does not bar "the admission of evidence . . . relevant to prove some fact" other than an individual's propensity to act in a certain fashion].) "Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 [stating law in context of evidence of defendant's gang ties].) Evidence pertaining to a *defendant's* possible gang ties should be treated with caution, as it "may have a highly inflammatory impact on the jury." (*Ibid*.) Given a defendant's constitutional right to a fair trial, it is less clear whether this particular caution should apply to gang evidence pertaining to the alleged *victim* of a crime. Regardless, we review the court's refusal to allow noncharacter gang evidence pertaining to Israel for an abuse of discretion. (*Id*. at p. 193.) [10]

---

[10] "A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence — including the rule stated in Evidence Code section 352 — generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Thus, on appeal, we review the exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*Cornwell*, at p. 81; *People v. Holloway* (2004) 33 Cal.4th 96, 134.)

18

We agree with the court that the gang evidence was relevant to defendant's state of mind.[11] (See Evid. Code, §§210, 350.) Although there were certainly key factual disputes about the precise actions of defendant, Israel, and Joanna, as well as the timeline of the fatal events, defendant's subjective state of mind and the objective reasonableness of his state of mind were arguably the most important issues for the jury.[12] Statements by Israel (or others) to defendant that Israel was a gang member or affiliated with a gang would tend to frighten (or enhance the fear already being felt by) defendant. For instance, our Supreme Court held that a defendant's statement that he was a "homeboy" was relevant to a kidnapping and robbery prosecution because the victim testified she understood this to be a reference to gang affiliation and the statement thereby aided in

---

[11] The parties' briefs blend the question of character evidence and defendant's state of mind, but they are clearly separate paths to admission of the gang evidence. Character evidence is relevant to an individual's propensity to perform conduct in conformity with the relevant character trait — here, committing violent acts. State of mind evidence is contingent on proving the circumstances (true or not) known to the relevant actor, rather than the actual character traits of someone else. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1060 ["A defendant charged with assaultive crimes who claims self-defense may present evidence that the alleged victim had previously threatened him"]; *Myers*, *supra*, 148 Cal.App.4th at pp. 552-553 [defendant's testimony about police "officer's aggressive conduct at the time of the incident did not constitute character evidence for the purposes of Evidence Code section 1103," but rather the circumstances of the alleged crime].)

[12] The jury was asked to determine whether defendant was guilty of first degree murder, second degree murder, or manslaughter, or whether he was not guilty of any crime by reason of justification — i.e., defense of self or others. For a killing or other use of force "to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) To establish imperfect self-defense and thereby receive a conviction of manslaughter, defendant must have had an "'*honest but unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury . . . .'" (*In re Christian S.* (1994) 7 Cal.4th 768, 773.)

19

establishing the element of fear necessary to a robbery conviction. (*People v. Mendoza* (2000) 24 Cal.4th 130, 163, 178.)[13]

       We disagree with the court that the "probative value" of this evidence was "substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In reaching its conclusion, the court implicitly discounted the potential probative value of the evidence in an arbitrary fashion. The court focused on the potential prejudice of linking Israel to a gang, suggesting the jury (which was situated comfortably in a court of law and not subjected to explicit threats from Israel) could not treat the evidence fairly because the mere mention of the word gang would undermine their ability to deliberate reasonably and according to their instructions. But the same logic should have led the court to consider the even greater power Israel's alleged claim to gang status could have had on defendant's state of mind, regardless of whether such reaction was reasonable (relevant to self-defense) or unreasonable (relevant to imperfect self-defense). The court's ruling thereby contradicts itself. If the mention of a gang is menacing to the point of distraction to jurors, imagine the effect on an individual actually faced with a threat of physical violence linked up with gang affiliation.

---

[13] Juries are entitled to find that murder (but not first degree premeditated murder) is a natural and probable consequence of an assault or battery involving gang members. (See *People v. Chiu* (2014) 59 Cal.4th 155; *People v. Medina* (2009) 46 Cal.4th 913, 922-924 [killing of fleeing victim by one gang member's gunshot was reasonably foreseeable consequence of all three gang members repeatedly challenging victim with gang inquiries and engaging in a fistfight]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1448-1453 [does not matter that assault did not go according to plan]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight].) Hence, it is only logical to suppose that an individual threatened with violence would be more afraid if a gang affiliation is referenced alongside that threat of violence.

The court's emphasis on the lack of evidence of Israel's gang membership was beside the point for purposes of defendant's state of mind. The trial was unlikely to devolve into a battle on this issue, for the simple reason that defense counsel did not wish to prove Israel was a gang member.

Moreover, this is not a case in which the gang evidence would have been a misdirection play to confuse jurors about the conduct of a blameless victim. The jury was already informed of a variety of reasons to think the worst of Israel (his past violence, his threats, and his alcohol and drug abuse). The jury was already aware that Israel drove to defendant's residence to either (depending on their view of the evidence) frighten, attack, or kill defendant and/or Joanna. The jury was allowed to hear that Israel was under the influence of alcohol and methamphetamine, and possessed a knife on his person, at the time he was shot. The jury was allowed to hear that Israel pushed his wife and one-year-old daughter to the ground immediately before being shot. Any additional ill feeling generated toward Israel by the gang evidence cannot be said to "substantially outweigh" the probative value of this evidence. (Evid. Code, § 352.)

In sum, defendant should have been allowed to include, in his testimony about Israel's threats and his own reaction to those threats, mention of the gang to which Israel claimed affiliation. And to the extent any other witness (such as Joanna) could establish defendant was made aware of Israel's claims to gang affiliation prior to the shooting, such witness also should have been allowed to testify accordingly.

The only remaining issue is whether the court's error in excluding this evidence was harmless. We disagree with defendant that the evidentiary error amounted to an infringement of defendant's constitutional right to mount a defense. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt standard applies in such cases]; *People v. Boyette* (2002) 29 Cal.4th 381, 427 [rejecting "attempt to inflate garden-variety evidentiary questions into constitutional ones"].) Instead, we may reverse the judgment only if "'after an examination of the entire cause, including the

21

evidence,' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

For a number of reasons, we conclude the court's error was harmless. First, as previously noted in concluding the gang evidence would not be particularly prejudicial to the prosecution, Israel was already proven to be a violent, abusive, unsympathetic individual who had stabbed two people in the past, beaten Joanna, and threatened to kill defendant. Israel was killed while having ingested an aggression-inducing mix of alcohol and methamphetamine. Israel had his trusty folding knife (with a four-inch blade) on his person. Israel specifically sought out defendant at defendant's residence and issued threats and taunts. Israel's having hung out with gangs and invoked the gang as part of his threats to defendant, while relevant and potentially important, was (under the specific circumstances of this case) a marginal addition to the evidence concerning Israel rather than a central part of the whole picture. (Cf. *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 828 [even assuming error, it was harmless to have excluded prior violent conduct of victim because defendant was allowed to testify regarding past fights with victim and details of altercation leading to victim's death].)

Second, the actual behavior of defendant belied the claim of self-defense or imperfect self-defense. Defendant shot Israel in the chest, pumped his shotgun, moved closer to Israel, and shot him in the head, instantly killing Israel. The jury found defendant not guilty of first degree murder, rejecting the notion that he planned ahead of the confrontation to kill Israel. But the jury also rejected self-defense, imperfect or otherwise. The second shot was an insurmountable barrier to defendant succeeding on the grounds of self-defense, whether perfect or imperfect. Israel was on the ground with a shotgun wound to his chest (which expert testimony suggested would have been fatal

22

within minutes).[14] The key question for the jury was whether they believed defendant when he testified that Israel was still a threat at that point. Whatever importance Israel's professed gang affiliations may have had at the outset of the confrontation (e.g., the need for defendant to carry a loaded shotgun to the encounter, the need for defendant to fire the first shot), there is no reasonable probability that the gang evidence could have affected the jury's view on the question of the second shot.

Third and finally, defendant could have been partially contradicted with his own prior statements had he testified that Israel's mention of a gang was particularly terrifying. The prosecutor introduced portions of a postarrest interview of defendant as impeachment evidence. This same interview included a portion pertaining to Israel's professed gang affiliation, which was not played for the jury. In this interview, defendant agreed with the police officer's description of Israel as a "Mexican cowboy." (Italics omitted.) Defendant added, "I mean the stupid guy was undecided on what he was exactly because he told me he was a gangster. He was calling me a gangster and I don't know what else. I don't . . . . I don't understand. Why would he call me gangster? He was more of a gangster. [Then] sometimes he would come in boots and hat and all the shit." (Italics omitted.) Defendant seemingly dismissed the idea that Israel's gang affiliates would act on his threats by characterizing his group as "[t]hose little kids that don't do anything." (Italics omitted.) Defendant described his own background in Salinas, where he hung out with "Vagos" gang members, including his own brother. Defendant suggested the gang situation was much more frightening in Salinas than Indio. In sum, had he been allowed to testify regarding the enhanced fear he felt as a result of

---

[14] As the prosecutor stated in closing argument, "That one shot to the chest, very likely voluntary manslaughter. [The second shot] to someone's face, when you are readily upset, when you are angry, that's murder. That's why we're here. That second shot. He might have had 30 seconds to live . . . but it wasn't for the defendant to take."

Israel's professed gang affiliation, defendant's prior out-of-court statements likely would have been used to weaken such testimony.

## DISPOSITION

The judgment is affirmed.

IKOLA, J.

WE CONCUR:

ARONSON, ACTING P. J.

FYBEL, J.